We do not retain jurisdiction.

714 A.2d 986

MELODY STEVENSON, PLAINTIFF, v. ROBERT STEVENSON, DEFENDANT.

Superior Court of New Jersey
Chancery Division
Family Part
Camden County

Decided March 13, 1998.

*Melody Stevenson,* pro se.

*Robert Stevenson,* pro se.

COOK, J.S.C.

## *INTRODUCTION*

In what appears as a matter of first impression in New Jersey, this case presents the question whether a final restraining order issued under the *Prevention of Domestic Violence Act, N.J.S.A.* 2C:25–17 –33, *must* be dissolved in all cases where the plaintiff so requests. For the reasons expressed below, this court determines that dissolution of a final restraining order at the request of plaintiff is not mandatory. Rather, dissolution in such cases is at the court's discretion, and should depend upon a showing of good cause, with an independent finding by the court based upon the facts presented in each case.

## *FACTUAL AND PROCEDURAL BACKGROUND*

On November 6, 1997, the parties appeared before this court for a hearing on plaintiff's complaint charging defendant with numerous violations of the *Prevention of Domestic Violence Act* (the Act). The testimony of plaintiff, the photographic exhibits offered by her counsel, and the graphic appearance at the hearing of the residual effects of the severe physical injuries she suffered, established by a clear preponderance of the evidence that defendant

was guilty of attempted criminal homicide, aggravated assault, terroristic threats, criminal restraint and burglary, all in violation of the Act. These violations arose from a brutal, sadistic and prolonged attack by defendant on his wife during the late evening and early morning hours of October 29–30, 1997. The uncontroverted facts showed that during a drunken rage,[1] defendant beat and tortured his wife so severely that she was critically injured, and had to be medevac'd by emergency helicopter to the Cooper Hospital Trauma Unit in Camden.

Plaintiff, who appeared at the hearing with two black and severely swollen eyes, testified that on the late evening of October 29, 1997, defendant came into the marital bedroom, went into a total rage, punched plaintiff with both fists, held her down with his knees, kicked her in the back and ribs, and continued beating her there for approximately 25, minutes. Defendant then dragged her by her hair down the stairs and out of the house, and shoved her into his van, saying that they were going to go to a friend's house. Plaintiff was bleeding from her ears, nose and mouth. She got out of the van, ran to a neighbor's house and banged on the door. Defendant chased her, screaming he would kill her, and that he should have killed her before. She was "petrified". He caught up to her outside the neighbor's house, and choked her with both hands around her throat. He then dragged her down the street and pushed her back into the van. She escaped again and ran to another neighbor's house. At that point, defendant's vicious attack on his wife had been going on for 45 minutes. She went inside the neighbor's house and asked her neighbor to call the police, while she went into a powder room, closed the door, and tried to hide from defendant. Defendant went into the neighbor's house and proceeded to rip the powder room door off its hinges. The door landed on plaintiff. He dragged her out of the house, and back towards their house. Plaintiff grabbed onto trees along

---

[1] Defendant admitted to Dr. Kurlansik of the Steininger Center that he was "inebriated" when he savagely beat his wife, and that "every time they fought he was drunk". Dr. Kurlansik's report is discussed herein.

the way, trying to resist. He was furious because she had asked her neighbor to call the police. Finally, he let go of her, got into the van and left. She was badly injured and very scared. A neighbor came with a blanket and rendered first aid. She was rushed by ambulance to the Emergency Room of West Jersey Hospital. She had three large lumps on her head, two black eyes, blood running from her ears, and abrasions and lacerations all over her body. She also had trouble breathing. At the West Jersey Hospital Emergency Room, she was diagnosed as having head and lung injuries, and was in such critical condition that she had to be medevac'd by helicopter to the Cooper Hospital Trauma Center. She had a fractured skull, a concussion, four broken ribs, and a punctured lung (pneumothorax), in addition to the injuries noted above. She remained hospitalized at Cooper for several days, and was still under medical care at the time of the hearing on November 6, 1997.

At the hearing, the court had the opportunity not only to hear the testimony of plaintiff, but to observe her injuries and review the photographic exhibits submitted by her counsel as well. Plaintiff's eyes were severely swollen, black and blue, and almost closed. She was in obvious physical pain and distress. The photographic exhibits submitted by plaintiff's counsel depicted her injuries, as well as the powder room door that defendant ripped off its hinges in the neighbor's home where plaintiff sought refuge. The photos, including those of plaintiff's facial and head injuries, and the hole in her chest where a tube was inserted to re-inflate her punctured lung, depicted a severally beaten and battered woman.

Plaintiff testified she was in fear of defendant. She related a prior history of domestic violence on his, part, including previous assaults. She was afraid he would take their ten year-old son and leave the area, noting that he would do anything and everything to get physical custody and keep their son away from her. She added that their ten year-old son was in the house throughout the forty-five minute period that the beating of his mother took place.

Defendant, who was represented by counsel at the hearing, did not testify. No evidence was presented to controvert plaintiff's testimony, or the domestic violence charges she made against him.

Because of (1) the barbaric conduct of the defendant during the nightmarish incident of October 29 – 30, 1997; (2) the evidence of his drunkenness that night and in the past; (3) his prior history of domestic violence; and (4) plaintiff's clearly expressed fear that defendant would take her son away if not restrained, a final restraining order was entered. The order prohibited any further acts of domestic violence, and barred him from having any contact or communication with the plaintiff and from harassing or stalking her. The order also required defendant to undergo substance abuse and psychological evaluations, and restricted him to supervised visitation only. He was also ordered to pay plaintiff's attorneys' fees of $2,400 by December 12, 1997; child and spousal support; all household expenses; and other expenses enumerated in the order. The deadline for payment of plaintiff's counsel fees was modified by an order of December 23, 1997 entered by consent of both parties, through their counsel. That modification required payments by defendant of $1,000 by January 7, 1998; $500 by February 7, 1998; $500 by March 7, 1998; and $400 by April 7, 1998.

At the hearing on plaintiff's request that the court dissolve the final restraining order, several violations of the order came to light. For example, it appeared that the defendant has engaged in *unsupervised* visitation with the child, including trips out-of-state. He has continually attempted to contact plaintiff. He has not abided by the psychotherapy recommendations of the Steininger Center, nor with the substance abuse recommendations of Segaloff. Both of those reports are discussed below. He has not paid any of the attorney's fees he was ordered to pay. In short, the defendant has flouted and violated the final restraining order.

At the hearing on March 13, 1998, plaintiff asked the court to dissolve the final restraining order. She claimed she had reconsidered her relationship with the defendant and wanted him to be

involved with their son's life. She requested that the restraints be dissolved, but only on the condition that he commit no future violence.

The final restraining order permitted *supervised visitation* only, pending a risk assessment and further order of the court. Risk assessment evaluations, substance abuse evaluations, and psychological evaluations of defendant were received by the court. At the request of and by agreement of both parties, through their counsel, copies of those evaluation reports were provided to the parties and their counsel. Plaintiff testified she had read the reports.

Those reports include (1) a psychological evaluation of defendant by Dr. Stuart Kurlansik, Chief Psychologist, The Steininger Center; and (2) a drug and alcohol abuse evaluation of defendant by Patricia Thurman, a substance abuse counsellor at the Substance Abuse Center of Southern New Jersey, Inc., t/a Segaloff Counseling and Treatment Center.

The Steininger Center Referral Form recites the "Reason for Referral" as follows:

> Defendant beat his wife with his fists about the head and chest causing a fractured skull, broken ribs and a collapsed lung. Defendant also strangled and attempted to suffocate his wife while threatening to kill her. Defendant has been charged with attempted murder, aggravated assault and terroristic threats. Plaintiff obtained a restraining order against defendant.

The report of Dr. Kurlansik of The Steininger Center is extensive, and covers eight pages. Dr. Kurlansik conducted two testing and interview sessions with defendant, each a week apart. Dr. Kurlansik reported *inter alia* that:

> When asked to describe the events which resulted in his referral to this office, Mr. Stevenson reported that "I assaulted my wife. *I beat her up very badly.*"

> .  .  .  .  .  .  .  .

> He reported prior fights with his wife, but "nothing to this degree." He claimed that *every time they fought, he was drunk.* He stated that she never had to go to the hospital in previous fights. He stated that the previous fights involved punching, although not to the face. He stated that he bruised her in prior fights, but then claimed that she bruises easily. He reported that he had been in fights with other people during the period of his marriage as well. He stated that he

boxes and plays hockey, and fought during the course of a game. He stated that he has had a few fights outside of the sport events, however. He then said there had been a handful, the most recent occurring at a roller rink. He stated that he coaches a team, and that the other coach had been a poor sport, and "we ended up in a physical confrontation." This occurred a year ago. Another time, four years ago, he stated that he was a spectator at an ice hockey gain in which his son was playing. He stated that a parent of one of his teams' children became involved in a fight with three of the opposing team's parents, and he "intervened." *He reported having a fight five years ago in a bar, and stated that he was intoxicated at the time.* He stated that he had played a game of pool for twenty dollars and the other person lost the game, and did not want to pay, "*so I hit him.*"

He denied any arrests as a result of fighting as an adult. As a juvenile, he stated that he was incarcerated at Glen Mills for a total of three years, and stated that "we could go on for hours" regarding juvenile incidents. He stated that he was at Glen Mills twice—once at age thirteen for assault, and the second time at age fourteen for robbery.

His current marriage has been his only marriage. He married on December 28, 1986. The most recent separation occurred October 29, 1997. He reported one other separation, two years ago. He stated that "things just weren't working well." This separation lasted about three months.

Mr. Stevenson reported no DYFS involvement in his family of origin, but stated that he left home when he was about twelve years old. He stated that he ran away to California, and knew no one there. He was arrested for trying to rob a restaurant, was held for sixty days, and was sent to Glen Mills.... He was later arrested for fighting, and was again sent to Glen Mills for fourteen months. He claimed that he requested to go to Glen Mills, "because I knew it was the best thing for me." He left Glen Mills when he turned seventeen.

He reported that he has a *short temper*, although "not now." He claimed that the experience which brought him here has changed his life and a short temper is "not gonna be a trait for me anymore."

He stated that he is casual drinker of alcohol, and may drink twice a month. He stated that "*when I drink, I drink.*" "*I may drink a bottle of wine myself.*" When asked why this was the case, he stated that "*I'm a compulsive personality type.*" He stated that he has not had a drink in four weeks. *He reported being inebriated*

*when "I did what I did,"* but said that he plans not to drink again, "at least that's my goal."

* * * * * * * *

An objective measure of personality functioning, the Millon Clinical Multiaxial Inventory—III, was administered.... [T]he interpretive report stated that "on the basis of the test data (*assuming denial is not present*), *it may be reasonable to assume that the patient is exhibiting psychological dysfunction of mild to moderate severity.*". An Axis I (an "acute" disorder) diagnosis of Generalized Anxiety Disorder is suggested, while Axis II (enduring features of an individual's personality, and therefore more "chronic") diagnosis of: *"Antisocial Personality Traits," "Passive–Aggressive Personality Traits," "Avoidant Personality Traits,"* and *"Sadistic Personality Features"* are suggested. The NCS report hypothesizes, based on Mr. Stevenson's responses, that he may manifest (among other things) a lack of empathy, intolerance, and display "impulsive and quixotic emotionality." It goes on to state that *individuals with his profile can "be easily provoked into sudden and unpredictable reactions," which "may be punctuated periodically by angry outbursts."*

* * * * * * * *

*Recommendations:*
*It is strongly urged that Mr. Stevenson participate in psychotherapy, to help him learn to control his anger* (and to find more appropriate ways of expressing it), as well as to reduce his anxiety. Psychotherapy might also address what appears to be an issue with *excessive use of alcohol at times.*

In her substance abuse evaluation of defendant, Ms. Thurman, a substance abuse counsellor at the Substance Abuse Center of Southern New Jersey, t/a Segaloff Counseling and Treatment Center, reported that:

* * * * * * * *

Robert Stevenson was referred to the Segaloff Counseling and Treatment Center for a substance abuse evaluation. The evaluation was requested because the client was charged with domestic violence and there are allegations he abuses alcohol and/or drugs.

* * * * * * * *

Robert, a 34 year-old white male, was interviewed on November 29, 1997, at 8:30 A.M. Eye contact was fair, affect closed, guarded and *very accusatory toward his estranged wife, Melody.*

When asked about his use of drugs and alcoholic beverages, Mr. Stevenson states he's never used drugs of any kind and attempts to portray himself as a modest drinker, however, says the *day he was charged "I had a little too much to drink".* According to him, he consumes "2 glasses of wine weekly" and denied ever experiencing any problems with his drinking. *The client did acknowledge on the*

*day of the domestic violence incident he drank "6 glasses of wine and about 2 beers" preceding the incident, which he admits "I hit her, kicked her and pulled her by hair".* But, Robert was quick to defend his actions by blaming the problem on "I caught my wife trying to buy drugs on the phone" and sees no relationship between his drinking and his current family problems.

Finally, during the interview with Mr. Stevenson, he appeared closed, guarded and *manipulative,* causing us to suspect he was purposefully providing misleading information concerning his true involvement with alcohol and/or drugs.

Concluding, based upon the limited information available to us, *we strongly suspect Mr. Stevenson is drinking more than he reports and we feel he would greatly benefit from outpatient counseling to enable him to cease drinking and evaluate his family problems in a drug free state. The fact the client admits he was under the influence at the time of the altercation with his wife prompts us to question the severity of his drinking and it's relationship to his family problems.* Also, Mr. Stevenson's evasive answers concerning the exact nature of his treatment at Starting Point causes us to suspect the client may in fact already be in treatment for substance abuse and we are recommending he provide documentation to the Court specifying exactly nature of his therapy. If Mr. Stevenson is not already in treatment for substance abuse, *we would then recommend he be mandated to complete at least 3 months in substance abuse treatment at Camden County Division of Alcoholism and Substance Abuse, 225–5070.*

At a risk assessment conference with a Family Court staff therapist, plaintiff expressed concern over defendant's *"need for control,"* and again said she feared he would flee with their son, perhaps to Arizona. She related that defendant had often talked of leaving the area for Arizona and had made several trips there. She also said that on more than one occasion, defendant has threatened that he "will do anything and everything he has to" in order to gain custody of his son. Plaintiff requested that supervised visitation continue.

There remain several criminal charges pending against defendant as a result of his sadistic attack on his wife, including criminal attempt—murder; aggravated assault; burglary; criminal mischief; threatened violence; and criminal restraint. He is reportedly free on $75,000 cash bail, and is awaiting further proceedings in the criminal case.

## THE STANDARDS GOVERNING DISSOLUTION OF A DOMESTIC VIOLENCE FINAL RESTRAINING ORDER

When considering a plaintiff's request to dissolve the Final Restraining Order, a court must not forget that it is the public policy of the State of New Jersey, expressed by the Legislature in the Act, *N.J.S.A.* 2C:25–18, *that victims of domestic violence must be assured the maximum protection from abuse the law can provide* ; that *the official response to domestic violence, including that of the courts, shall communicate the attitude that domestic violent behavior will not be excused or tolerated; and that it is the responsibility of the courts to protect victims of domestic violence* by ordering those remedies and sanctions that are *available to assure the safety of the victims* and the public. Addressing the problem of domestic violence and its prevention, the preamble to the Act states:

> The Legislature finds and declares that domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. It is therefore the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.

> Further, it is the responsibility of the courts to protect victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions, and by ordering those remedies and sanctions, that are available to assure the safety of the victims and the public. To that end, the Legislature encourages the training of all police and judicial personnel in the procedures and enforcement of this act, and about the social and psychological contest in which domestic violence occurs; and it further encourages the broad application of the remedies available under this act in the civil and criminal courts of this State. It is further intended that the official response to domestic violence shall communicate the attitude that violent behavior will not be excused or tolerated, and shall make clear the fact that the existing criminal laws and civil remedies created under this act will be enforced without regard to the fact that the violence grows out of a domestic situation.

N.J.S.A. 2C:25–18; *see also, Torres v. Lancellotti*, 257 *N.J.Super.* 126, 129, 607 A.2d 1375 (Ch.Div.1992).

In addition, the Legislature has mandated that a final restraining order cannot be dissolved, *unless good cause is shown.* The Act, *N.J.S.A.* 2C:25–29d, provides that:

> *Upon good cause shown*, any final order *may* be dissolved or modified upon application to the Family Part of the Chancery Division of the Superior Court, but only if the judge who dissolves or modifies the order is the same judge who entered the order, or has available a complete record of the hearing or hearings on which the order was based. (emphasis added).

Even where good cause is shown, the language of the statute, *N.J.S.A.* 2C:25–29d., expressly makes dissolution *discretionary,* not mandatory ("... final order *may* be dissolved").

Plaintiff's dissolution request, made despite the latest brutal beating she suffered at the hands of a drunken husband who has a past history of wife-beating and an alcohol abuse problem, is consistent with phase three of "the battered woman's syndrome." That phase of the battering cycle is characterized by a period of loving behavior by the batterer, during which pleas for forgiveness and protestations of devotion are often mixed with promises to seek counselling, stop drinking and refrain from further violence. A period of relative calm may last as long as several months, but in a battering relationship the affection and contrition of the batterer will eventually fade, and phases one and two, the "tension-building" phase and the "acute battering inci-dent" phase, will start anew. *State v. Kelly,* 97 *N.J.* 178, 192–94, 478 *A.*2d 364 (1984). Plaintiff has gone through the battering cycle with defendant at least twice. Through this dissolution request she seeks to remain in the situation. She thus meets the definition of a "battered woman." *Id.* at 193, 478 *A.*2d 364, quoting from *L. Walker, The Battered Woman* at xv (1979). The New Jersey Legislature recognized the plight of battered women when it enacted the Act and provided battered women with the remedy of *permanent* restraining orders against wife-beaters and other batterers of women. *Id.* at 190–91 n. 2, 478 *A.*2d 364.

In making her dissolution request, the victim of the brutal battering in this case did not advise the court she has no fear of defendant and no concern that he may savage her again. Indeed, she certainly has that fear and concern in mind, for she asks the court to dissolve the final restraining order, only *on the condition that he commit no further violence.* Obviously, if there were no basis at all for plaintiff to fear further violence—as most certainly there is, given the nature and extent of this attack and defendant's past history of violence, including domestic violence against plaintiff; then there would be no need to condition dissolution on the absence of further violence. But there is that inherent fear, a fear that this court and any reasonable person viewing this situation would certainly share.

■ Regarding fear of future domestic violence, one court has observed that:

The Act protects victims from physical harm. Yet, physical safety is not all that the Legislature intended to protect. Recognizing that domestic violence occurs in a relationship *where one party asserts power and control over the other,* the victim is also protected from mental or emotional harm.

Fear of the defendant is the center of the cycle of power and control existing in domestic violence situations. Restraining orders have the effect of empowering the victim to stand up to the defendant. Thus, fear is important to consider.

Fear of the defendant is especially important when the parties share children. In domestic violence cases involving children, the victim usually has custody of the children. *See N.J.S.A.* 2C:25–29(b)(11) (presumption that victim shall have custody of the children). It is also presumed that the custodial parent will act in the best interests of the children. *Gubernat v. Deremer,* 140 N.J. 120, 142, 657 A.2d 856 (1995). However, where the victim has continual fear of the defendant, the defendant's perceived control over the victim may attenuate the victim's ability to act in the best interests of the children. Moreover, fear might attenuate the ability of the victim to act in his or her own best interests. Accordingly, it is important to consider the victim's fear of the defendant.

*Carfagno v. Carfagno,* 288 *N.J.Super.* 424, 436–37, 672 A.2d 751 (Ch.Div.1995) (emphasis added).

When considering the question of fear of defendant, *Carfagno* notes that the test should not be the victim's subjective fear. Rather, the test is one of *objective fear,* i.e., that fear which a reasonable victim similarly situated would have under the circumstances. The court in *Carfagno* said:

> A question remains whether the court should focus on subjective fear or objective fear. Subjective fear is the fear produced by and within the mind of the victim as the victim understands and communicates it. *Objective fear is that fear which a reasonable victim similarly situated would have under the circumstances.* The court holds that courts should focus on objective fear. The Legislature intended the courts to consider objective—not subjective—fear.
>
> *Id.* at 437, 672 *A.*2d 751 (emphasis added).

■ When considering a victim's application to dissolve, and whether there is good cause to do so, a court must determine whether objective fear can be said to continue to exist, and also whether there is a real danger of domestic violence recurring, in the event the restraining order is dissolved. Particularly is this so in a case like this, involving the commission of the vicious beating of a woman by her husband during a drunken rage[2], and a documented history of previous violence and brutality by the defendant. Whether or not this plaintiff would agree, it is clear that *from the standpoint of objective fear,* that a reasonable victim of such a brutal beating by a husband, who has assaulted her in the past and has a history of other violent behavior, and is the subject of experts' findings of uncontrolled anger and excessive use of alcohol, would have a reasonable fear that future violence by her husband would occur, were the restraining order dissolved.

■ Even in cases of reconciliation, the court must still make *an independent finding* that continued protection is unnecessary before vacating a restraining order. *Torres v. Lancellotti,* 257 *N.J.Super.* 126, 607 *A.*2d 1375 (Ch.Div.1992). The "good cause" proviso of *N.J.S.A.* 2C:25–29d requires no less. Without making an independent finding based on the objective evidence, a court does not meet the public policy dictates of the Act that victims of domestic violence must be assured the maximum protection from abuse the law can provide; that the official response to domestic violence, including that of the courts, shall communicate the attitude that domestic violent behavior will not be excused or

---

[2] Alcohol is often an important component of wife-beating. *State v. Kelly, supra,* 97 *N.J.* at 193 n. 5, 478 *A.*2d 364.

tolerated; and that it is the responsibility of the courts to protect victims of domestic violence by ordering those remedies and sanctions that are available to assure the safety of the victims and the public. *N.J.S.A.* 2C:25–18.[3]

In this case, given the uncontroverted evidence of defendant's brutality against his wife, his history of violence both within and without the domestic arena, his alcohol abuse and uncontrolled assaultive behavior when under the influence, and the reports before the court, including those of The Steininger Center and Segaloff, a reasonable, objective and independent determination of the facts leads to the inescapable conclusion that a real threat of recurrence of domestic violence by defendant upon his battered wife will exist, if the Final Restraining Order is dissolved. This court will not be an accomplice to further violence by this defendant, by wholly dissolving at this point the restraints that have been entered against him. Accordingly, and for lack of good cause shown, plaintiff's application to dissolve the Final Restraining Order is denied.

The court does find cause to modify the Final Restraining Order with respect to certain matters concerning the child of the parties, as follows. The final restraining order shall remain in full force and effect, except that contact or communication between plaintiff and defendant relating to supervised visitation, and to the safety, health, education, welfare, status or activities of the minor child of the parties, shall be permitted. There shall be no further modification of the final restraining order, without application to and with the express approval of the court.

---

[3] To the extent that the opinion in *Carfagno, 288 N.J.Super.* at 435, 672 A.2d 751, may be read as standing for the proposition that a court must dissolve a domestic violence final restraining order in every case where the victim so requests, and should do so without any further legal analysis, this court would respectfully disagree. The Act provides that dissolution is discretionary, and a showing of good cause is always required. Depending on the facts of a particular case, the victim's request and her reasons for requesting dissolution may or may not constitute good cause.

Defendant shall promptly undergo psychotherapy as recommended in the report of Dr. Kurlansik of The Steininger Center. He shall also promptly undergo at least three months of substance abuse treatment at the Camden County Division of Alcoholism and Substance Abuse, as recommended by Patricia Thurman of the Segaloff Counseling and Treatment Center. Upon completion of psychotherapy and substance abuse treatment, the court will consider unsupervised visitation.