45 A.3d 371

N.G., PLAINTIFF–RESPONDENT, v. J.P.,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 30, 2012—Decided June 18, 2012.

400

Before Judges BAXTER, NUGENT and CARCHMAN.

*Jack Venturi* argued the cause for appellant (*Jack Venturi & Associates*, attorneys; *Mr. Venturi*, of counsel and on the briefs; *Michael B. Roberts*, on the briefs).

*Mark H. Sobel* argued the cause for respondent (*Greenbaum, Rowe, Smith & Davis, L.L.P.*, attorneys; *Mr. Sobel*, of counsel and on the brief; *Dennis F. Feeney*, on the brief).

The opinion of the court was delivered by

BAXTER, J.A.D.

Defendant J.P. appeals from the issuance of a final restraining order (FRO) against him under the Prevention of Domestic Violence Act of 1991 (the Act), *N.J.S.A.* 2C:25–17 to –35. The parties are adult siblings who have not resided together since 1960, when they were both children. We nonetheless concur in the judge's determination that the harassment of plaintiff by defendant over the intervening decades—although sporadic—conferred jurisdiction on the Family Part to issue the FRO, in light of the fact that the present incidents arose directly from the parties' acrimonious family relationship and their status as former household members. We likewise affirm the judge's finding that defendant's conduct constituted harassment and stalking within the meaning of *N.J.S.A.* 2C:33–4 and 2C:12–10(b), respectively. We reject defen-

dant's assertion that the judge was biased and denied him a fair trial. Finally, we affirm the award of attorney's fees, as such fees are expressly available under the Act, and the judge correctly applied the factors enumerated in *Rule* 4:42–9(b).

We do, however, agree with defendant that the FRO—which barred him from entering the entire Township of Millburn—failed to give sufficient consideration to defendant's legitimate need to attend church and visit his physician within the confines of the Township. We remand so that the judge may set precise conditions respecting church attendance and doctor's visits, but in all other respects, we affirm the ban on defendant's entering the Township of Millburn.

I.

Defendant J.P. and plaintiff N.G. are siblings. Defendant, who is currently sixty-six years old, has suffered from severe obsessive compulsive disorder since childhood and felt abandoned by his family at a young age. His animosity toward his family intensified when, during his teenage years, his parents secured his involuntary commitment to a psychiatric hospital. Defendant harbored a deep resentment of plaintiff and the parties' mother, B.P., as evidenced by his references to his family as a "cesspool" of human beings and "scum." He acknowledged that he curses the day he was born into his family.

Plaintiff and defendant last lived together in 1960 when she was ten years old and he was fifteen years old. The record contains testimony describing confrontations between plaintiff and defendant in the 1960s as well as in the late 1980s. According to plaintiff, in the 1960s, defendant hit her over the head with a baseball bat. In 1989, defendant and another individual confronted plaintiff in a school parking lot after she dropped off a group of kindergarten children, including her daughter, at school. On that occasion, defendant yelled at plaintiff and acted in an aggressive manner, leaving plaintiff shaken. On another occasion in 1989, defendant encountered plaintiff while she was at a local pizzeria,

picking up pizza for her child's birthday party. In a "singing" manner, defendant said to her, "I hate your guts, I'm going to get you."

As a result of those incidents, plaintiff sought, and obtained, an order for preliminary restraints against defendant.[1] The May 23, 1989 preliminary restraints barred defendant from contacting plaintiff, disparaging her, trespassing on her property, intruding into her personal life or business affairs, and "conducting any sort of picketing, public protest, sit-in, [or] demonstration" adjacent to plaintiff's residence.

On February 27, 1991, less than two years later, a judge entered an FRO prohibiting defendant from coming within four blocks of the residences of both plaintiff and B.P. The FRO was vacated in 1993 as to B.P. as part of a confidential settlement agreement, which was predicated on the condition that defendant cease his behavior toward B.P., and that he undergo psychiatric treatment. Because the 1993 settlement agreement involved only defendant and B.P., it had no effect on the 1991 restraints issued in favor of plaintiff and against defendant.

The record contains no evidence of any conflict between the parties between 1993 and 2010. However, in February 2010, defendant began picketing in front of plaintiff's Millburn residence, and did so on twenty-nine separate occasions from February to July 2010. Nearly every time defendant appeared in front of plaintiff's property, he traveled from one end of her front yard to the other, turning around and going back, repeating the same pattern for as long as three to four hours, even in the rain.

On the twenty-nine occasions that defendant marched back and forth in front of plaintiff's home, he repeatedly stated, "F- - -[2] you

[1] Plaintiff's sister, B., was also a plaintiff, as was their mother, B.P., in the 1989 filing. The preliminary restraints issued against defendant on May 23, 1989 barred him from having any contact with B.P., B., or plaintiff.

[2] Defendant uttered the full expletive.

G- - - - - - - -," [3] "Burn in hell," and "I hope you rot in hell." He often accompanied these remarks by an obscene gesture in which he raised each of his middle fingers.

On one occasion in May 2010, as plaintiff began driving out of her driveway, she found defendant standing at the end of the driveway, obstructing her vehicle and giving her a "frightening hateful look." On another occasion, as plaintiff's husband A.G. drove toward their home, defendant "charged" at his car.

On July 23, 2010, as a result of the incidents in 2010, plaintiff filed a domestic violence complaint against defendant, which resulted in a nine-day trial that began on September 1, and concluded on November 17, 2010.

On September 1, before the trial began, defendant moved for recusal of the judge, alleging that the judge may have been prejudiced by a letter brief submitted by B.P. in a separate action.[4] Plaintiff opposed defendant's recusal motion. Attached to B.P.'s letter brief was a transcript of a July 7, 2010 confrontation between defendant and Millburn Township Police Officer Azzopardi,[5] which included defendant's comments about the municipal court judge who had issued a TRO against defendant at B.P.'s request. The transcript reflected that as Azzopardi approached defendant to serve him with the TRO, defendant began screaming, stating that he would not accept the document and would refuse to obey it. Defendant told Officer Azzopardi that he would "rip up" the TRO and "spit on it."

Defendant then shouted, "Judge H.,[6] drop dead in your f——ing [7] black robe," "Judge H., go f—— yourself," "Go f—— your mother,

---

[3] Defendant stated plaintiff's full last name.

[4] The same judge who presided over plaintiff's domestic violence trial also presided over B.P.'s trial. The judge denied plaintiff's and B.P.'s motion to consolidate the two proceedings, choosing to hear them separately.

[5] His surname is also spelled Asparti in some portions of the record.

[6] We have omitted the municipal court judge's surname.

Judge H.," and "Where is your mother buried, Judge H.? I want to spit on her grave." The Law Division judge denied defendant's recusal motion.

Plaintiff and her husband testified that they were frightened of defendant and alarmed by his bizarre conduct. Plaintiff described defendant's picketing in front of her house on the twenty-nine occasions between February and July 2010. She explained that defendant's behavior caused her to suffer emotional distress and difficulty sleeping. Plaintiff also testified that while she and A.G. were waiting in the courtroom on the return date of B.P.'s TRO, defendant lunged at plaintiff in a threatening manner, forcing a sheriff's officer to physically escort defendant from the courtroom.

Plaintiff was so afraid of what defendant might do that she had even contemplated leaving New Jersey, which would require her to live apart from A.G., who is a licensed professional in New Jersey. A.G. testified that after his mother-in-law died,[8] he feared defendant would focus his behavior solely on plaintiff.

A.G. also testified that on July 7, 2010, after defendant marched in front of plaintiff's residence for an hour shouting "F- - - you G- - - - - - - -, I hope you rot in hell," A.G. and plaintiff received a telephone call from B.P. B.P. asked A.G. to immediately come to her home, which was a few minutes away. Upon arrival at his mother-in-law's home, A.G. observed defendant wandering back and forth in B.P.'s front yard. When A.G. entered B.P.'s home to talk to her, defendant threatened him.

In the middle of the trial, defendant moved to dismiss plaintiff's domestic violence complaint for lack of jurisdiction. The judge denied the motion, reasoning that the parties "have a family[-]like relationship and for purposes of the statute are former members of the same household." In the course of his ruling, the judge noted that a different judge had previously exercised jurisdiction

---

7 Defendant uttered the entire expletive.

8 B.P. died in October 2010.

over the parties in prior domestic violence proceedings in 1989 and again in 1991.

During the trial, defendant exhibited hostility toward plaintiff, calling her a "despicable human being," a "despicable liar," "despicable scum," and a "miscreant." He also stated, "I will not dignify her. I hate her guts." He yelled at a sheriff's officer and berated the judge, calling him "a dictator." Defendant claimed "there [wa]s a malodorous scent," and an "odor of prejudice," which he claimed could be detected "as soon as you walk into this [c]ourt."

Defendant's testimony partially contradicted the accounts plaintiff and her husband provided. Defendant testified that he had appeared at plaintiff's residence "probably 8, 9 times." He acknowledged appearing at plaintiff's property two to three days per week, for between two and four hours at a time, from approximately April or May 2010 until the filing of plaintiff's complaint. Defendant admitted that he raised both middle fingers in the air while walking back and forth in front of plaintiff's residence at least "a couple of times," although he claimed he was making a "victory" sign. Defendant stated that he behaved in this way because he "was trying to make a point in a peaceful and non-violent, and least obtrusive and non-threatening fashion." He asserted that he marched in front of plaintiff's home only to let her know that "she cannot tarnish [him] and assassinate [his] character with the Millburn Police. And ... cannot be allowed to do everything possible ... to keep [him] from having phone calls and meetings with [his] maternal parent[.]"

At the conclusion of the trial, the judge ruled that defendant had committed the predicate acts of stalking and harassment in violation of the Act, and issued the FRO that is the subject of this appeal. The FRO barred defendant from contacting plaintiff or A.G., and barred defendant from entering any portion of the Township of Millburn. As soon as the judge stated that he intended to issue the FRO, defendant responded that he would not comply with the court's order, and he refused to forfeit any firearms in his possession. Upon hearing that he was prohibited

from entering Millburn, defendant claimed to worship at a church in Millburn, but would not disclose when or where he attended church.

On November 30, 2010, plaintiff filed a certification of attorney services at the judge's direction. Plaintiff sought an award of $45,050 in counsel fees against defendant. The judge granted plaintiff $32,500, memorializing the counsel fee award in an order of January 18, 2011. After defendant filed a notice of appeal, the judge issued a written amplification of his decision pursuant to *Rule* 2:5–1(b).

On appeal, defendant raises the following claims:

I. THE LOWER COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION.

II. THE FINAL RESTRAINING ORDER WAS UNCONSTITUTIONALLY BROAD IN SCOPE BECAUSE IT PROHIBITED [DEFENDANT] FROM ENTERING THE ENTIRE TOWNSHIP OF MILLBURN.

III. [DEFENDANT] WAS EXERCISING PROTECTED FREE SPEECH.

A. The Lower Court Erred When It Found That [Defendant] Stalked [Plaintiff].

B. The Lower Court Erred When It Found That [Defendant] Harassed [Plaintiff].

C. The Lower Court Erred When It Found That [Plaintiff] Possessed a Continuing Need for Protections under the [Act].

IV. THE LOWER COURT BASED ITS OPINION, IN PART, ON INADMISSIBLE EVIDENCE.

A. The Alleged Physical Attacks Which Occurred Over 50 Years Ago When the Parties Were Children Should Have Been Excluded.

B. Comments Made by [Defendant] Regard [sic] [the Municipal Court] Judge ... Should Have Been Excluded.

C. Existence of a Prior Restraining Order That Was Dismissed Should Have Been Excluded.

V. THE LOWER COURT ERRED WHEN IT DENIED [DEFENDANT'S] MOTION TO RESCUSE [SIC] THE JUDGE.

VI. THE DECISION SHOULD BE REVERSED AND REMANDED TO A NEW TRIAL JUDGE WHEN THE LOWER COURT DEMONSTRATED AN IMPROPER BIAS IN FAVOR OF THE PLAINTIFF AND PREJUDICE AGAINST THE DEFENDANT.

A. The Court's Refusal to Recuse Itself.

B. Lower Court Allowed Plaintiff's Witnesses to Testify but Precluded the Defendant's Witnesses from Testifying.

C. The Scope of the Restraints Were [sic] Punitive.

D. Lower Court Awarded $32,500 in Legal Fees against [Defendant].

## II.

 In Point I, defendant argues that the court lacked jurisdiction under the Act to issue the FRO, and that the judge committed reversible error when he refused to dismiss plaintiff's complaint. "The Act and its legislative history confirm that New Jersey has a strong policy against domestic violence." *Cesare v. Cesare*, 154 *N.J.* 394, 400, 713 *A*.2d 390 (1998). The Act is remedial in nature. *Ibid.* Remedial statutes should be construed liberally, giving their terms the most expansive reading of which they are reasonably susceptible. *Donelson v. DuPont Chambers Works*, 206 *N.J.* 243, 256, 20 *A*.3d 384 (2011).

The statutory term "[d]omestic violence" has been interpreted to apply to "a pattern of abusive and controlling behavior injurious to its victims." *Peranio v. Peranio*, 280 *N.J.Super.* 47, 52, 654 *A*.2d 495 (App.Div.1995). The Act defines a victim of domestic violence to include, in relevant part, "any person ... who has been subjected to domestic violence by ... any ... person who is a present or former household member." *N.J.S.A.* 2C:25–19(d).

 In determining whether a defendant is a "former household member" under the Act, the inquiry should be whether the "perpetrator's past domestic relationship with the alleged victim provides a special opportunity for abusive and controlling behavior." *Tribuzio v. Roder*, 356 *N.J.Super.* 590, 595, 813 *A*.2d 1210 (App.Div.2003) (internal citations omitted). The Act is directed at " 'violence that occurs in a family or family-like setting.' " *Smith v. Moore*, 298 *N.J.Super.* 121, 125, 689 *A*.2d 145 (App.Div.1997) (quoting *Jutchenko v. Jutchenko*, 283 *N.J.Super.* 17, 20, 660 *A*.2d 1267 (App.Div.1995)).

 *Coleman v. Romano*, 388 *N.J.Super.* 342, 351, 908 *A*.2d 254 (Ch.Div.2006), sets forth a six-factor test to determine whether jurisdiction exists based on the parties' status as "former house-

hold members," focusing on "whether the parties have been so entangled, emotionally or physically—or they will be in the future—that the court should invoke the Act to protect the plaintiff and prevent further violence." *Ibid.* The six factors identified in *Coleman* are:

(1) the nature and duration of the prior relationship;

(2) whether the past domestic relationship provides a special opportunity for abuse and controlling behavior;

(3) the passage of time since the end of the relationship;

(4) the extent and nature of any intervening contacts;

(5) the nature of the precipitating incident; and

(6) the likelihood of ongoing contact or relationship.

[*Id.* at 351–52, 908 *A.2d* 254.]

### A. The First Factor

■ We begin our analysis by focusing on the first factor, the nature and duration of the prior relationship between the parties, *id.* at 351, 908 *A.2d* 254. Prior to 2010, plaintiff and defendant had not been in contact with each other since 1991. However, starting in 2010, defendant threatened, insulted and antagonized plaintiff several hours a day for months at a time. Defendant's testimony confirmed plaintiff's assertion that the nature of their prior relationship was extremely poor, when he testified that throughout his entire life he perceived his estrangement from plaintiff and other family members as "torture" and deeply resented plaintiff. He admitted that he held plaintiff responsible for the fact that B.P., his mother, refused to communicate with him.

In evaluating the nature of a domestic relationship, courts have established jurisdiction under the Act in cases involving parties who never lived together. *See, e.g., South v. North,* 304 *N.J.Super.* 104, 112, 698 *A.2d* 553 (Ch.Div.1997) (finding jurisdiction where the parties "shared food, cooking chores and responsibility for disciplining the child, and even—on occasion—living quarters, ... [and] attended family functions as a group"); *Desiato v. Abbott,* 261 *N.J.Super.* 30, 34, 617 *A.2d* 678 (Ch.Div.1992). However, in a case involving adult siblings who had not lived together

since childhood, we rejected the trial court's finding of jurisdiction, reasoning, "we do not believe that the Legislature could have intended the protections of the Act to extend to conduct related to a dispute between two persons who have not resided together in the same household for twenty years[.]" *Jutchenko, supra*, 283 *N.J.Super.* at 20, 660 *A.*2d 1267.

This case and *Jutchenko* are factually dissimilar. In *Jutchenko*, one adult brother accused the other brother of abusing the latter's own children, and the accused brother responded by threatening his brother's life. *Id.* at 19, 660 *A.*2d 1267. Unlike this case, the misconduct of the defendant in *Jutchenko* while an adult did not pertain to any incident or issue that occurred or evolved from the period when the two brothers lived in the same household.

Moreover, in the nearly two decades since *Jutchenko* was decided, its rationale has been eroded. The focus has shifted from an analysis of the amount of time that has elapsed since the parties last resided together to an evaluation of whether the current conflict arose from the prior domestic relationship. Courts subsequent to *Jutchenko* have recognized that "the court's predicate for exercising jurisdiction is that the 'former household' relationship essentially places the plaintiff in a more susceptible position for abusive and controlling behavior in the hands of the defendant." *Storch v. Sauerhoff*, 334 *N.J.Super.* 226, 233, 757 *A.*2d 836 (Ch.Div.2000). *See also Coleman, supra*, 388 *N.J.Super.* at 358, 908 *A.*2d 254 (noting that the length of time since the parties shared a household was only one factor to be considered when examining the overall emotional and financial relationship between the parties).

We agree with the trial judge's finding that although plaintiff and defendant have been estranged for decades, defendant's present attempt to reestablish contact with plaintiff springs from the antagonism he harbored toward her while they were members of the same household, an antagonism that continued in the intervening decades. The long duration of the parties' relationship, albeit composed of sporadic episodes of intense strife, supports the

judge's conclusion that the first *Coleman* factor was satisfied. . The extremely antagonistic nature of the parties' relationship, and the fact that defendant's current behavior is a direct outgrowth of the parties' earlier household relationship, weigh in favor of finding jurisdiction under the Act.

### B. The Second Factor

The second *Coleman* factor requires an evaluation of whether the past domestic relationship provides a special opportunity for abuse and controlling behavior. *Id.* at 351, 908 *A.*2d 254. The protections of the Act are available to victims not only of physical abuse and financial control, but also of emotional abuse. For instance, in *South, supra,* 304 *N.J.Super.* at 114, 698 *A.*2d 553, we observed, "This case does not involve a dispute over money or property. Instead, it is a dispute over the controlling and abusive behavior of the defendant[,] . . . involving an assault and years of physical, mental and emotional abuse of an elderly woman who lives in fear of her grandson's father."

Here, defendant's testimony concerning the motivation for his behavior makes it clear that if plaintiff were not his sister, defendant would not have behaved toward her as he did. Furthermore, plaintiff's testimony supports the conclusion that events during her childhood, such as defendant's assault with a baseball bat, made her fearful of defendant's conduct and threats in adulthood. The record supports the conclusion that the antagonism defendant has felt toward plaintiff since childhood has fueled his abusive behavior toward her decades later; and that defendant's abusive behavior toward plaintiff in 2010 would not have occurred absent their history of a fractured childhood relationship.

Because the past domestic relationship between the parties is the sole motivation for defendant's abusive behavior toward plaintiff, and because this relationship has rendered plaintiff particularly vulnerable to defendant's abuse and attempts to control, the second *Coleman* factor weighs in favor of jurisdiction under the Act.

## C. The Third Factor

The third factor requires an analysis of the amount of time that has elapsed since the parties last lived together. *Coleman, supra,* 388 *N.J.Super.* at 351, 908 *A.*2d 254. Although plaintiff and defendant had contact with each other in the late 1980s and frequent contact in 2010, the parties have not lived together since 1960. However, "[t]he passage of time from the end of the ... relationship is only one factor to be considered in determining the availability of the Act's protection." *Tribuzio, supra,* 356 *N.J.Super.* at 597, 813 *A.*2d 1210. Furthermore, as we have already discussed, defendant experiences his childhood traumas as fresh wounds that motivate his current behavior. The fact that the parties have lived apart for more than fifty years does not defeat jurisdiction under the Act.

## D. The Fourth Factor

The fourth *Coleman* factor requires an analysis of the nature and extent of any contact between the parties between the time they ceased living together in the same household and the time when the plaintiff seeks protection under the Act. *Coleman, supra,* 388 *N.J.Super.* at 351, 908 *A.*2d 254. Here, the parties ceased living together in 1960 and plaintiff did not seek the FRO that is the subject of this appeal until 2010, fifty years later.

In the five decades that elapsed after the parties ceased living together as siblings, plaintiff was forced to seek the protection of the court on two occasions, in 1989 and 1991. Although defendant's conduct in 1989 and 1991 is distant in time from both 1960, when the parties stopped living together, and from 2010, when plaintiff sought protection under the Act, the severity of the incidents in 1989 and 1991 justify a finding of jurisdiction.

As we have noted, the 1989 order granting plaintiff preliminary restraints against defendant prohibited him from trespassing on plaintiff's property, intruding into her personal life or business affairs, or "conducting any sort of picketing, public protest, sit-in, [or] demonstration" adjacent to plaintiff's residence or place of

business. The record on appeal does not contain any of the pleadings from the 1989 proceedings. Nonetheless, we presume, and defendant does not dispute, that he engaged in the "trespassing" and "picketing" in front of plaintiff's home that the 1989 order prohibited. Like the 1989 order of preliminary restraints, the 1991 FRO prohibited defendant from coming within four blocks of plaintiff's residence. Thus, although the intervening events occurred as long ago as 1989 and 1991, they were of such severity as to weigh in favor of the exercise of jurisdiction.

### E. The Fifth Factor

The fifth *Coleman* factor requires an analysis of the nature of the precipitating incident. *Id.* at 352, 908 *A.*2d 254. When the precipitating incident relates to the prior domestic relationship, jurisdiction under the Act is appropriate. *Id.* at 353, 908 *A.*2d 254. Indeed, "[b]usiness contacts [between the parties] are less significant than family or domestic-related contacts." *Id.* at 352–53, 908 *A.*2d 254 (citing *Sperling v. Teplitsky,* 294 *N.J.Super.* 312, 316, 321, 683 *A.*2d 244 (Ch.Div.1996) (finding no jurisdiction where the defendant kicked the plaintiff's current boyfriend's car over a business dispute unrelated to the plaintiff)). Here, defendant's behavior in 2010 was motivated exclusively by what he perceived as his mother's and sister's unjust treatment in sending him away from their family and then refusing to maintain contact with him.

As the *Coleman* court also observed, the nature of the precipitating incident is relevant to the jurisdictional analysis because an incident "marked by violence or threats also strengthen[s] the jurisdictional claim, and absence of violence weakens it." *Supra,* 388 *N.J.Super.* at 353, 908 *A.*2d 254. Here, defendant's conduct was persistent, in that it lasted for several months, and was threatening, due to both defendant's verbal taunts and threats, and his menacing behavior in approaching plaintiff and A.G. in their cars on two occasions. For these reasons, the nature of the precipitating incident weighs in favor of jurisdiction.

*F. The Sixth Factor*

The sixth *Coleman* factor requires an analysis of the likelihood of ongoing contact or a continuing relationship. *Id.* at 352, 908 A.2d 254. Defendant's own testimony provides ample evidence that his behavior will not cease. In particular, defendant testified to his continuing hatred of plaintiff, and did not dispute plaintiff's testimony that he intended to "hound [her] until the grave." Additionally, defendant lacks insight into the unlawful nature of his conduct, maintaining that marching and picketing in front of his sister's home is permissible because she had "tarnish[ed] [him] and assassinate[d] [his] character with Millburn police" and should not be "allowed" to do so any longer. And, although defendant's vow to disobey the FRO was uttered after the judge had already issued the FRO, defendant's defiant attitude speaks volumes, as it portends future ominous behavior on his part toward his sister. The high likelihood of persistent domestic violence supports the exercise of jurisdiction.

Because all of the *Coleman* factors, with the possible exception of the third, weigh in favor of jurisdiction, we affirm the trial judge's denial of defendant's motion to dismiss.

## III.

In Point II, defendant asserts that the FRO—which barred him from all of Millburn—was oppressively and impermissibly broad. Remedies under the Act are liberally construed for the protection and safety of victims and the public at large. *Cesare, supra,* 154 *N.J.* at 400, 713 *A.2d* 390; *State v. Hoffman,* 149 *N.J.* 564, 590, 695 *A.2d* 236 (1997); *Stevenson v. Stevenson,* 314 *N.J.Super.* 350, 361, 714 *A.2d* 986 (Ch.Div.1998). Upon finding a violation of the Act, the judge is authorized to grant any relief necessary to prevent further abuse. *N.J.S.A.* 2C:25–29(b). Specific remedies listed in the Act include, in pertinent part, an order restraining the defendant from further acts of domestic violence, and restricting the defendant from communicating with,

stalking or harassing the victim. *N.J.S.A.* 2C:25–29(b)(7). The Act further authorizes

> (6) An order restraining the defendant from entering the residence, property, school, or place of employment of the victim or of other family or household members of the victim and *requiring the defendant to stay away from any specified place that is named in the order and is frequented regularly by the victim or other family or household members.*
>
> [*N.J.S.A.* 2C:25–29(b)(6) (emphasis added).]

Defendant contends that the trial judge's restraining order banning him from the entire Township of Millburn violates his Fourteenth Amendment right of free travel, *Saenz v. Roe,* 526 *U.S.* 489, 498, 119 *S.Ct.* 1518, 1524, 143 *L.Ed.*2d 689, 701 (1999); *United States v. Guest,* 383 *U.S.* 745, 757, 86 *S.Ct.* 1170, 1178, 16 *L.Ed.*2d 239, 249 (1966), and that the ban also violates his First Amendment right to free exercise of religion, in light of defendant's testimony that he worshipped at a church in Millburn.

Plaintiff responds that the trial judge's decision to ban defendant from the Township of Millburn is necessary to protect her from further abuse. In issuing such a broad restraint, the judge reasoned that defendant defied less restrictive restraining orders in the past; he cursed the municipal judge who issued such a restraining order; he refused to relinquish firearms; he told the judge that he attended a church in Millburn but would not disclose its location so that the judge could tailor the order; he has had menacing encounters with plaintiff in Millburn in the past; and plaintiff frequents downtown Millburn and cannot be assured of her safety if defendant is allowed to be there.

In *Zappaunbulso v. Zappaunbulso,* 367 *N.J.Super.* 216, 228–29, 842 *A.*2d 300 (App.Div.2004), we affirmed an FRO that required the defendant to vacate a house in the neighborhood where his ex-wife resided. After noting that the two houses were approximately 1000 feet apart and that the defendant could observe the plaintiff's activities on her property from his residence, *id.* at 224, 842 *A.*2d 300, the trial judge concluded that the defendant's intent in choosing where to live was to harass and stalk the plaintiff, in violation of existing restraining orders. *Id.* at 227, 842 *A.*2d 300.

We agreed that requiring the defendant to move out of his residence was necessary to protect the plaintiff from stalking and harassment by the defendant. *Id.* at 227–28, 842 *A*.2d 300.

*Zappaunbulso* instructs us to consider a defendant's intent and past conduct in determining the necessary scope of a restraint. Although in 2010 defendant did not have contact with plaintiff anywhere other than at her own home, we agree with the trial judge's determination that now that defendant is barred from that location, a strong likelihood exists that he will attempt to pursue her elsewhere. Defendant's defiant attitude toward the issuance of the TRO to B.P., and his vow to disobey it, signal that extraordinary measures are "necessary," *N.J.S.A.* 2C:25–29(b)(6), for plaintiff's protection. Under such circumstances, a more expansive protection should be afforded to plaintiff. *Crespo v. Crespo,* 408 *N.J.Super.* 25, 37–39, 972 *A*.2d 1169 (App.Div.2009), *aff'd o.b.,* 201 *N.J.* 207, 989 *A*.2d 827 (2010) (observing that the defendant's freedom of movement must yield to measures designed to protect the plaintiff).

We affirm the issuance of the ban on defendant entering Millburn; however, we remand for a hearing to give defendant a fuller opportunity to describe his church attendance and any visits to his doctors in Millburn.[9] The judge may make that determination based on affidavits alone, if there are no contested facts. Defendant shall file any such affidavit within thirty days of the issuance of this opinion. If he fails to do so, his right to seek such relief will be deemed waived.

## IV.

In Point III, defendant argues that the judge erred by finding defendant's conduct constituted harassment and stalking, an error

---

[9] At appellate oral argument, defendant's attorney agreed that banning defendant from entering Millburn would be permissible if defendant were given an opportunity to carve out specific, time-limited exceptions that would be incorporated in an order.

that was compounded by the judge's refusal to recognize that defendant's conduct constituted an exercise of free speech protected by the First Amendment. Our scope of review of a trial judge's finding of a predicate offense under the Act is narrow. In *Cesare,* the Supreme Court summarized the applicable scope of appellate review in domestic violence cases as follows:

> The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility. Because a trial court hears the case, sees [and] observes the witnesses, and hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of witnesses. Therefore, an appellate court should not disturb the factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.
> [*Supra,* 154 *N.J.* at 411–12, 713 *A.*2d 390 (internal citations and quotation marks omitted).]

Defendant argues that his behavior did not constitute the offenses of stalking and harassment, which are predicates to a finding of domestic violence, *N.J.S.A.* 2C:25–19(a)(13)–(14), warranting a restraining order. The stalking and harassment statutes have been narrowly drawn so as not to impinge on protected speech. *State v. L.C.,* 283 *N.J.Super.* 441, 450, 662 *A.*2d 577 (App.Div.1995), *certif. denied,* 143 *N.J.* 325, 670 *A.*2d 1066 (1996). Indeed, because the First Amendment to the United States Constitution "permits regulation of conduct, not mere expression[,]" the speech punished by the harassment statute "must be uttered with the specific intention of harassing the listener." *Ibid.* A restraining order premised on harassment cannot be entered "if based on a mere expression of opinion utilizing offensive language." *Ibid. See State v. Cardell,* 318 *N.J.Super.* 175, 184, 723 *A.*2d 111 (App.Div.) (discussing and rejecting a constitutional challenge to the stalking statute), *certif. denied,* 158 *N.J.* 687, 731 *A.*2d 46 (1999).

Stalking is defined as follows: "A person is guilty of stalking . . . if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person

to fear for his safety or the safety of a third person or suffer other emotional distress." *N.J.S.A.* 2C:12–10(b). The statute defines "[c]ourse of conduct" as:

repeatedly maintaining a visual or physical proximity to a person ... following, monitoring, observing, surveilling, threatening, or communicating to or about, a person. or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying ... verbal ... threats ... or threats implied by conduct or a combination thereof directed at or toward a person. [*N.J.S.A.* 2C:12–10(a)(1).]

"Repeatedly" is defined as "two or more occasions." *N.J.S.A.* 2C:12–10(a)(2). "Emotional distress" is defined as "significant mental suffering or distress." *N.J.S.A.* 2C:12–10(a)(3).

The trial court correctly found that defendant committed the predicate offense of stalking. Plaintiff and A.G. testified that defendant maintained a visual and physical proximity to plaintiff by appearing on plaintiff's property and pacing back and forth in front of her front yard for hours at a time, several days a week. His conduct was repeated, in that he engaged in this behavior twenty-nine times between February and July 2010. He communicated with, and threatened plaintiff, by means of offensive hand gestures, shouting curses at her while she was at home, and, on one occasion, blocking plaintiff from exiting her property in her car. Defendant caused emotional distress, as plaintiff testified that she did not feel safe in her own home because of defendant's conduct.

Defendant's attempt to distinguish his own conduct from that recognized as stalking in the case law is meritless. He argues that the "typical" stalking case involves a defendant repeatedly following a victim against the latter's wishes or surreptitiously recording or viewing the victim in the latter's home. He relies upon *State v. Gandhi,* 201 *N.J.* 161, 989 *A.*2d 256 (2010) and *H.E.S. v. J.C.S.,* 175 *N.J.* 309, 328, 815 *A.*2d 405 (2003) for this proposition. However, the text of the stalking statute contains no such qualifying language. Moreover, the facts in *Gandhi* are distinguishable, and defendant's reliance on it unfounded. *Gandhi* involved a single visit of the defendant to the plaintiff's house,

followed by telephone calls and letters sent to the plaintiff's house, conduct similar to, but far less confrontational, than defendant's conduct in this case. *Supra*, 201 *N.J.* at 172–73, 989 *A.2d* 256. *H.E.S.* involved, among other incidents, confrontations at the plaintiff's home, much like the facts of this case. *Supra*, 175 *N.J.* at 316–17, 815 *A.2d* 405.

We reject defendant's argument that because no reasonable person would fear for his or her safety as a consequence of defendant's conduct, the elements of the stalking statute were not satisfied. Although defendant did not expressly threaten plaintiff in 2010, defendant repeatedly cursed her and fantasized about a violent and painful death for plaintiff, telling her that he hoped she would burn and rot in hell. Defendant blocked plaintiff's exit from her home and menaced her. His very obsession with her, and statement that he hoped she would "rot in hell" were threatening in nature, and a reasonable person would fear for his or her safety as a consequence. The judge properly concluded that defendant stalked plaintiff.

██ We next address defendant's challenge to the judge's finding that defendant harassed plaintiff. In relevant part, harassment is defined as follows:

a person commits a petty disorderly persons offense if, with purpose to harass another, he:

a. Makes, or causes to be made, a communication or communications ... in offensively coarse language, or any other manner likely to cause annoyance or alarm;

. . . .

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[*N.J.S.A.* 2C:33–4.]

The subsections of the harassment statute are "free-standing, because each defines an offense in its own right." *State v. Mortimer*, 135 *N.J.* 517, 525, 641 *A.2d* 257, *cert. denied*, 513 *U.S.* 970, 115 *S.Ct.* 440, 130 *L.Ed.2d* 351 (1994). "The purpose of subsection (c) is to reach conduct not covered by subsection[ ](a)[.]" *Hoffman, supra*, 149 *N.J.* at 580, 695 *A.2d* 236.

"Annoyance" under subsection (a) means to "disturb, irritate or bother"; "serious annoyance" under subsection (c) means to "weary, worry, trouble, or offend." *Id.* at 580–81, 695 *A.*2d 236.

■ "A finding of a purpose to harass may be inferred from the evidence" as well as from common sense and experience. *Id.* at 577, 695 *A.*2d 236. Three elements are necessary to establish harassment proscribed by *N.J.S.A.* 2C:33–4(a):

(1) defendant made or caused to be made a communication; (2) defendant's purpose in making or causing the communication to be made was to harass another person; and (3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.

[*Id.* at 576, 695 *A.*2d 236.]

As required by subsection (a) of the harassment statute, defendant communicated with plaintiff. He demonstrated on her property, addressed her directly by saying, "I hope you rot in hell," and "F--- you, G--------," and gestured with his middle finger in the direction of her home. Defendant's claim that he was merely protesting plaintiff's treatment of him is not borne out by his conduct, which consisted exclusively of repeated curses and offensive hand gestures.

Indeed, aside from hurling insults at plaintiff, defendant made no effort to communicate to plaintiff the basis of his grievance against her; nor did he attempt to resolve his grievance. The absence of such content undermines defendant's argument that his intent was other than to harass plaintiff.

Furthermore, as required by subsection (a), the fact that defendant engaged in identical conduct on plaintiff's property on twenty-nine occasions, demonstrates that his conduct was "likely to cause annoyance or alarm." Moreover, defendant's conduct satisfies subsection (c), as it constitutes a "course of alarming conduct" or "repeatedly committed acts" committed to "alarm" plaintiff. Finally, there can be no doubt that defendant's purpose was to harass plaintiff. We affirm the judge's finding that defendant committed the predicate act of harassment.

Defendant's remaining arguments in Point III—that his behavior constituted protected free speech, and that the issuance of the FRO was not necessary for plaintiff's protection—lack sufficient merit to warrant discussion. *R.* 2:11-3(e)(1)(A) and (E).

## V.

We address defendant's remaining arguments in the aggregate, as we are satisfied that they too lack sufficient merit to warrant discussion. *Ibid.* In particular, we are satisfied that the judge did not base his opinion on inadmissible evidence, as the admission of testimony about defendant's conduct in 1969 and in the late 1980s, and about defendant's comments concerning the municipal court judge, did not constitute an abuse of discretion. We are likewise satisfied that the judge was not biased against defendant, did not issue an FRO whose scope was "punitive," and did not abuse his discretion by awarding plaintiff counsel fees in the amount of $32,500.

As for the fee award, we add only the following comments. An award of counsel fees in a domestic violence proceeding requires no special showing, as an award of counsel fees is a form of "monetary compensation" under *N.J.S.A.* 2C:25-29(b)(4). *McGowan v. O'Rourke,* 391 *N.J.Super.* 502, 507, 918 *A.*2d 716 (App.Div.2007). And, when issuing the fee award, the judge carefully applied all of the factors specified in *Rule* 4:42-9(b), *RPC* 1.5(a) and *Schmidt v. Schmidt,* 262 *N.J.Super.* 451, 454, 620 *A.*2d 1388 (Ch.Div.1992). Although the judge did not consider whether defendant had the ability to pay counsel fees to plaintiff, defendant refused to supply any information on his financial status, which made it impossible for the judge to consider that factor.

## VI.

Affirmed. Remanded for the limited purpose of entertaining defendant's request for a narrowing of the ban on his entry into the confines of the Township of Millburn.