# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5712-17T1

L.E.,

     Plaintiff-Respondent,

v.

K.E.W.,

     Defendant-Appellant.

_____

        Argued October 2, 2019 – Decided January 22, 2020

        Before Judges Ostrer and Susswein.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FV-01-0070-19.

        Rory Joseph Wells argued the cause for appellant (Goldman Wells Legal Group, LLC, attorneys; Rory Joseph Wells, on the brief).

        Respondent has not filed a brief.

PER CURIAM

Defendant, K.E.W., appeals from a final restraining order (FRO) entered in favor of plaintiff, L.E., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. This case presents unusual circumstances that test the boundaries of the PDVA. We have previously noted that harassment is the most frequently reported predicate offense among those statutorily recognized as a basis for a finding of domestic violence. J.D. v. M.D.F., 207 N.J. 458, 475 (2001). The sheer number of domestic violence cases that involve harassment reflects the endless variety of ways in which people can alarm and seriously annoy others with whom they have a personal relationship.

In this instance, the conduct constituting the predicate act of harassment is nothing short of bizarre. K.E.W. perpetrated an elaborate and disturbing hoax, deceiving plaintiff into believing she, K.E.W., had terminal cancer. Defendant exploited plaintiff's charity, causing plaintiff to spend countless hours providing comfort, support, and a compassionate ear. Ultimately, defendant's actions induced plaintiff to invite defendant to stay in plaintiff's household.

Defendant urges us to overturn the FRO on three grounds: (1) defendant was not a "household member" within the meaning of the PDVA's definition of victim of domestic violence; (2) plaintiff failed to prove by a preponderance of the evidence that defendant committed a predicate act constituting harassment

A-5712-17T1

in violation of N.J.S.A. 2C:34-4(c); and (3) an FRO is not needed to protect plaintiff and her family from further abuse. Applying the deferential standard of review that governs this appeal, we uphold the trial court's ruling that defendant was a household member for purposes of establishing Family Part jurisdiction under the PDVA. We also uphold the trial court's ruling that the manner in which defendant carried out her elaborate deception evinced a purpose to alarm and seriously annoy plaintiff, thereby bringing defendant's disturbing ruse within the ambit of the quasi-criminal offense of harassment.

With respect to defendant's third contention, however, we remand the matter to the trial court to clarify whether the FRO was issued solely upon the need to protect the plaintiff and her family from further abuse, as distinct from the need to protect others in society from becoming new victims of defendant's deception. Also, remand is necessary for the trial court to explain more fully the basis for its finding that plaintiff and her family are in need of the protection of an FRO given that they are now aware of the hoax and thus unlikely to fall prey to any further deception by defendant.

I.

We derive the following pertinent facts from the record of the plenary hearing. Plaintiff met defendant through plaintiff's husband, who had sold

defendant a car believing that plaintiff was terminally ill with cancer. On June 3, 2018, defendant attended services at the church where plaintiff and her husband serve as pastors. Plaintiff "instantly connected" with defendant. Defendant led plaintiff to believe that she returned to the hospital after church in order to receive an experimental cancer treatment.

Later that night, plaintiff talked to defendant on the phone for three hours, praying, reading scripture, and playing Christian music. Defendant convinced plaintiff that she was in severe pain and that chemicals from her experimental treatment were severely burning her. At some point during the course of this lengthy telephone call, plaintiff's daughter received a text from a person purporting to be defendant's mother, explaining that the prayers were working and that "doctors and nurses can't believe this is going on."

The next morning, plaintiff received a text from a person purporting to be defendant's brother, claiming that defendant's mother had attempted to murder defendant while she was in the Intensive Care Unit. After receiving this text, plaintiff spoke on the phone with defendant for two or three hours during which plaintiff attempted to reassure defendant that she was safe and that she could talk freely to plaintiff.

A-5712-17T1

On June 5, defendant told plaintiff that the hospital had released her, but she was disoriented and did not know where she was. Plaintiff went looking for defendant, eventually finding her at a grocery store. Plaintiff and defendant sat in plaintiff's car for three hours while defendant discussed her hardships. Defendant confided that her father was on heroin, her mother would "drug her up" and send her into a hotel to have sex, and she had given birth to a daughter as a result of rape.

Plaintiff offered to take defendant home, but defendant said she could not go back there. Plaintiff then took defendant to plaintiff's house. Defendant initially said she was scared and could not go inside plaintiff's home, in part because she had "a thing with men." They sat in the car outside plaintiff's house until about 4:00 a.m., at which point defendant finally went inside and slept on the couch. On June 6, defendant stayed elsewhere, but she returned to plaintiff's house on June 7.

Plaintiff testified that defendant stayed in plaintiff's house for approximately four and a half weeks. Plaintiff disputed that estimate, stating she was probably there only half or a little over half of that time. In support of her contention at trial that she was not a household member, defendant presented receipts for her own apartment and texts from plaintiff asking her to "come over"

5

on several occasions. Defendant testified she never kept any personal belongings in plaintiff's house. Defendant also responded to a text message by saying that plaintiff's house was not her home. Plaintiff's husband replied, "we say it is." On another occasion when plaintiff texted defendant asking when she would be home, defendant replied that it is not her home, to which plaintiff replied, "Haha…it is now."

On July 5, defendant told plaintiff she was having a double transplant. Plaintiff received pictures of what appeared to be defendant in the hospital hooked up to "all these machines." A person purporting to be a hospital nurse called plaintiff and put a child purporting to be defendant's six-year-old daughter on the phone who urged "please pray for my mommy" and asked plaintiff if her mother was going to wake up.

At some point, one of plaintiff's relatives became suspicious of defendant and searched the internet for information about people who fake terminal illness. The search revealed that defendant had deceived others about her feigned medical condition. When presented with that information, plaintiff checked more closely and realized that defendant was not the person in the photograph who was hooked up to hospital machines.

## II.

After observing the witnesses at the plenary hearing, the judge found that defendant's testimony was not credible. In contrast, the trial court found plaintiff's testimony to be credible.

With respect to the threshold jurisdictional question, the trial court found that defendant was a "household member" for purposes of the PDVA because in June and July she stayed at plaintiff's home about fifty percent of the time. The trial court found that defendant moved into plaintiff's house and demanded time and attention from plaintiff and her family.

With respect to the predicate act of harassment, the court concluded that defendant misled plaintiff and her family into believing she was dying of cancer and that she was receiving treatments. The trial court also concluded that defendant was texting and calling plaintiff from various numbers as part of the hoax.

Much of the judge's oral opinion focused on the defendant's purpose for perpetrating the hoax. The judge found that defendant was getting "something out of doing this to people, meaning that she was getting some thrill, almost a narcissistic behavior that everyone would pay attention to her." The judge also

7

found that defendant was deceiving others for her own financial benefit,[1] sympathy, and "for some mental reason that she needs people to pay attention to her."

The trial judge concluded defendant's actions constituted harassment in violation of N.J.S.A. 2C:33-4(c). The court stated,

> I find that [Defendant] had the purpose to harass the plaintiff and her family and that purpose to harass was based on the fact that just because the defendant feels that nobody was hurt and she wants to give her ac -- her contritionary [sic] testimony today which, by the way, I -- I take no credence in.

The court reasoned "I can't find that there's any other purpose, but to harass people to get her own -- to gain her own mental or emotional needs to fulfill those, to gain financial needs that she's had." The court concluded:

> So I do find that she had the purpose to harass by fraudulent statements, by posing and lying -- posing as a victim or a -- of rape by her father, a victim of prostitution or forced prostitution, somebody who's ready to die from cancer. I find all of those statements were fraudulent to gain a sympathy of the plaintiff and I find that she had the purpose to harass under 2C:33-4c as I find that her behavior and statements and her

---

[1] The trial court remarked that defendant committed fraud. We note that fraud is not one of the listed predicate offenses in the PDVA. Although the evidence showed that plaintiff spent at least $1000 as a result of the defendant's deception, this case is not about money. Rather, it is about alarming conduct designed to inflict emotional abuse and to exert control.

fraud that she committed was a course of alarming conduct with the purpose to alarm or seriously annoy such other person, and she absolutely has done that to the plaintiff and her family. I have no doubt in my mind, much less than a preponderance of evidence.

With respect to the need for an FRO, the trial court found that unless an FRO were issued, defendant would continue to "victimize either the [plaintiff and her family] or others." Thus, the court concluded that plaintiff needed the protection of a no contact order that included plaintiff's out-of-state daughter, who defendant had recently tried to contact.

III.

We begin our analysis by acknowledging the deferential standard of review that governs this appeal. The scope of our review is a narrow one. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "In our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013) (citing Cesare, 154 N.J. at 411–12). Generally, findings by the Family Part are "binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 412 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). This deference is especially appropriate when the

evidence is "largely testimonial" and it "involves questions of credibility." Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). A trial court hears, sees, and observes the witnesses, putting that court in a better position than a reviewing court to evaluate witness credibility. S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010) (citing Cesare, 154 N.J. at 412).

The Family Part has special expertise in these matters. Cesare, 154 N.J. at 413. Accordingly, we will not "engage in an independent assessment of the evidence as if we were the court of first instance." R.G. v. R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 433 (App. Div. 2002) (editing marks omitted)). Nor will we disturb the trial court's findings of fact unless we are "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms, 65 N.J. at 484). However, when our review addresses a question of law, a "trial judge's findings are not entitled to that same degree of deference if they are based on a misunderstanding of the applicable legal principles." R.G., 449 N.J. Super. at 218 (quoting Z.P.R., 351 N.J. Super. at 434).

IV.

We first address defendant's contention that plaintiff failed to prove that the trial court had jurisdiction under the PVDA to hear this matter. Defendant contends that she was not a "household member" within the meaning of the PDVA because, according to her testimony, she only spent ten to twelve nights in plaintiff's home, had her own apartment, and produced text messages in which defendant told plaintiff and her husband that their house was not her home.

The PDVA requires a person seeking an FRO to prove that at least one of several specified domestic relationships exist between the plaintiff and the defendant. Formerly, the statute defined a victim of domestic violence to include a person "who has been subjected to domestic violence by…any…person who is a present or former household member." N.G. v. J.P., 426 N.J. Super. 398, 409 (App. Div. 2012) (quoting N.J.S.A. 2C:25-19(d) (1994), amended by L. 2015, c. 98, §2, eff. Aug. 10, 2015).

In South v. North, the Chancery Division noted that this provision of the PDVA did not define the term household member. 304 N.J. Super. 104, 109–10 (Ch. Div. 1997). In Fireman's Fund of N.J. v. Caldwell, the trial court after reviewing domestic violence cases described the term "household" as "chameleon-like, varying upon the context in which it is used," falling "into the

A-5712-17T1

category of terms which defy precise definition, yet are readily recognizable when encountered." 270 N.J. Super. 157, 163–64 (Law Div. 1993). In <u>R.G.</u>, we commented that, "[c]ourts struggled to determine the reach of this provision, especially when deciding what relationships fell within the net of 'former household members.'" 449 N.J. Super. at 219 (quoting <u>N.G.</u>, 426 N.J. Super. at 409).

Perhaps in response to those judicial concerns, the PDVA was amended in 2015 to clarify the scope of its coverage. The statute now provides that a victim of domestic violence includes "any person who is 18 years of age or older or who is an emancipated minor and who has been subjected to domestic violence by . . . any other person who is a present household member <u>or was at any time a household member</u>." N.J.S.A. 2C:25-19(d) (emphasis added). In <u>R.G.</u>, we characterized the 2015 amendments as having made "a significant change" in the reach of the "household member" provision, and we further held that the statutory amendments "express the Legislature's intent to broaden the application of this remedial Act." 449 N.J. Super. at 219–20.

The 2015 revision was not the first time the Legislature saw fit to expand the coverage of the PDVA with respect to persons who share a household. In <u>South v. North</u>, the Chancery Division noted that in 1991 the Legislature

A-5712-17T1

amended this same provision of the PDVA, changing "cohabitant" to "household member." 304 N.J. Super. at 109. We concluded that, "[t]he intent of the [1991] amendment was to expand coverage of the act." Ibid.

Thus, even before the 2015 clarifying, broadening amendments, we construed the PDVA's provisions "liberally." See Cesare, 154 N.J. at 400 ("Because the Domestic Violence Act is remedial in nature, it is to be liberally construed to achieve its salutary purposes."); see also N.J.S.A. 2C:25-18 ("It is . . . the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide."). Viewed in light of that principle of construction, we interpret the evolution of the PDVA as demonstrating that the Legislature has embraced a flexible approach in determining whether a domestic violence defendant is a member of the plaintiff's household, one not constrained by a rigid application of the traditional factors used to determine a person's primary residence. See, e.g., Bryant v. Burnett, 264 N.J. Super. 222, 224–26 (App. Div. 1993) ("[n]o precise period of residence is specified by the statute to make one a household member.").

In Tribuzio v. Roder, another case decided before the jurisdictional scope of the PDVA was enlarged by the 2015 amendments, we suggested that the "household member" inquiry should focus on whether the relationship presented

a "special opportunity for 'abusive and controlling behavior.'" 356 N.J. Super. 590, 595 (App. Div. 2003) (quoting Jutchenko v. Jutchenko, 283 N.J. Super. 17, 20 (App. Div. 1995)). Applying that criterion, defendant's abusive and controlling conduct was part and parcel of her scheme to gain access into plaintiff's household. Defendant's deception, designed to exploit plaintiff's charity, is what prompted plaintiff to offer defendant sanctuary and emotional support. Defendant's deception, in other words, was directly tied to and resulted in her becoming a member of plaintiff's household. The very nature of the hoax directed against a pastor created a special opportunity for abusive and controlling behavior.

We recognize that at the outset of the scam, defendant clearly was not a household member. We are aware of no authority, however, for the proposition that under the PDVA, a person must be a household member before initiating a continuing course of conduct that constitutes harassment. Cf. id. at 597–98 (perpetrator's past domestic relationship with alleged victim provided the special opportunity for abusive and controlling behavior). In this instance, defendant's uninterrupted course of deceptive conduct continued after defendant was invited to take refuge in plaintiff's household. Cf. N.J.S.A. 2C:1-6(c) ("[a]n offense is committed either when every element occurs or, if a legislative purpose to

14

prohibit a continuing course of conduct plainly appears,[2] at the time when the course of conduct or the defendant's complicity therein is terminated.").  The scam might have continued indefinitely had plaintiff's relative not alerted her that defendant perpetrated a similar hoax upon another family in another state.

In South, the court observed that the 1991 amendments had broadened the PDVA "to cover unforeseen and unspecified relationships that might deserve protection."  304 N.J. Super. at 109.  We concluded that the facts presented in that case involved controlling and abusive behavior and that ultimately, this was a "family-like setting."  Id. at 114 (quoting Smith v. Moore, 298 N.J. Super. 121, 125 (App. Div. 1997)).  In view of the 2015 amendments that even further broadened the coverage of the PDVA, we believe the reasoning in South is especially insightful.  The unusual situation before us falls into the category of an unforeseen and unspecified relationship, and also involves emotionally abusive and controlling behavior perpetrated by a person who gained entry to plaintiff's family.

In Desiato v. Abbott, yet another case decided before the 2015 amendments, we held that a flexible approach is needed to determine if there is

---

[2]  The type of harassment at issue in this case expressly requires proof of a "course of alarming conduct."  N.J.S.A. 2C:33-4(c) (emphasis added).

a "family-like setting," noting that "household" is a more comprehensive term than "family." 261 N.J. Super. 30, 33 (App. Div. 1992).

We identified five factors to consider in evaluating whether a person is a "household member" within the meaning of the PDVA:

> 1. Constancy of the relationship.
> 2. Over-night stays at each other's residence.
> 3. Personalty items such as jewelry, clothing and personal grooming effects stored at each other's residences.
> 4. Shared property arrangements, such as automobile usage, access to each other's bank accounts and one mailing address for billings or other legal purposes.
> 5. Familiarity with each other's siblings and parents socially in dining and/or entertainment activities together, and/or attendance together at extended family functions such as weddings.
>
> [Id. at 34.]

We applied those factors to the facts in that case and found the couple spent time as constant companions, had overnight stays on several occasions, the plaintiff kept personal effects at the defendant's house, and the couple dined with the defendant's parents. Ibid. This created a "family-like setting" whereby the parties would be deemed to be "household members." Id. at 35.

We need not decide whether and to what extent all of the factors enumerated in Desiato survive the expansion of the scope of the PDVA as a result of the 2015 amendments. Applying those factors to the record before us,

16

we conclude that defendant and plaintiff had, if only for a short period of time, developed a constant, family-like relationship. Defendant stayed overnight at plaintiff's house on multiple occasions, and defendant was familiar with and interacted with plaintiff's family, including her husband and children. When defendant was not physically staying at plaintiff's house, she was calling or texting plaintiff. Although defendant testified she did not keep any belongings at plaintiff's house, and although there is nothing in the record concerning shared property arrangements, those circumstances, while militating in defendant's favor under Desiato, do not diminish the conclusion that defendant through her deception worked her way into plaintiff's life, family, and household. We therefore hold that the Family Part properly exercised jurisdiction under the PDVA.

## V.

We turn next to defendant's contention that plaintiff failed to prove that she committed a predicate act of harassment. The TRO alleged that defendant violated what is sometimes described as a "catch all" provision of the harassment statute codified in subsection c of N.J.S.A. 2C:33-4. That portion of the statute provides that "a person commits a petty disorderly persons offense if, with purpose to harass another, he . . . [e]ngages in any other course of alarming

17

conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(c). That provision is meant to cover alarming conduct not otherwise specifically addressed in subsections (a) or (b) of N.J.S.A. 2C:33-4.[3]

On the facts presented in this case, we have no doubt that defendant engaged in a "course of conduct." The deception as to defendant's medical condition was not accomplished by a single, isolated communication. To the contrary, the ruse was perpetrated by means of multiple, lengthy communications done in person, by phone, and by text messages occurring during the span of several weeks. We also have no doubt that by any objective measure of personal interactions, defendant's course of conduct was alarming, provoking intense emotions.

---

[3] Compare N.J.S.A. 2C:33-4(a) ("A person commits a[n] . . . offense if, with purpose to harass another, he [m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm."), and N.J.S.A. 2C:33-4(b) ("A person commits a[n] . . . offense if, with purpose to harass another, he [s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so."), with N.J.S.A. 2C:33-4(c) ("A person commits a[n] . . . offense if, with purpose to harass another, he [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." (emphasis added)).

In State v. Hoffman, we explained that the term "annoy" as used in the harassment statue means "[t]o disturb or irritate, especially by continued or repeated acts; to weary or trouble; to irk; to offend." 149 N.J. 564, 580 (1997) (quoting Black's Law Dictionary 89 (6th ed. 1990)). In this instance, plaintiff testified she was exhausted while defendant stayed in her home, and defendant can hardly dispute that the hoax caused plaintiff to be wearied, worried, and troubled.

However, a plaintiff's subjective reaction is not enough to establish the offense of harassment. The inquiry instead focuses on the defendant's purpose, rather than the effect on the victim. N.J.S.A. 2C:2-2(b)(1); see also State v. Pomianek, 221 N.J. 66, 70 (2015) (finding a statute unconstitutional for focusing on the victim's perception instead of the defendant's intent). Defendant argued at the plenary hearing and contends now on appeal that she did not have the requisite culpable mental state to commit this offense. We find no basis to disturb the trial court's finding to the contrary.

"Integral to a finding of harassment…is the establishment of the purpose to harass…." Corrente v. Corrente, 281 N.J. Super. 243, 249 (App. Div. 1995) (citing D.C. v. T.H., 269 N.J. Super. 458, 461 (App. Div. 1994)). "A person acts purposely with respect to the nature of his conduct or a result thereof if it is his

19

conscious object to engage in conduct of that nature or to cause such a result." Hoffman, 149 N.J. at 577 (quoting N.J.S.A. 2C:2-2(b)(1)). Thus, to find harassment, there must be proof that a defendant's conscious object was to "harass[,]" that is, "'annoy'; [sic] 'torment'; [sic] 'wear out'; [sic] and 'exhaust.'" State v. Castagna, 387 N.J. Super. 598, 607 (App. Div. 2006) (quoting Webster's II New College Dictionary 504 (1995)).

Purpose is a state of mind that cannot be seen or felt by another. Absent an admission, a person's purpose must be adduced inferentially from his or her conduct and the surrounding circumstances. A trial judge may use common sense and experience to infer from the evidence presented a defendant's intent to harass. H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) ("'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience.") (quoting Hoffman, 149 N.J. at 577).

In Hoffman, the defendant sent the plaintiff torn-up copies of a motion to modify a support order. 149 N.J. at 577. The trial court found there was no legitimate purpose to send the document in that mutilated condition. Ibid. The Supreme Court held that in the absence of any legitimate purpose for the defendant's conduct, the trial court could reasonably infer that the defendant acted with the purpose to harass. Ibid.

20

In the present case, as in <u>Hoffman</u>, the trial judge found there could be no purpose other than to harass. Certainly, defendant had no legitimate purpose for deceiving plaintiff into believing that defendant was dying from cancer and suffering from oncology treatments. Nor was this scam designed to solicit financial contributions as part of a cold and calculated financial fraud. This was not a situation, in other words, where a profit-minded con artist feigns illness to induce multiple faceless victims to send monetary contributions to a Go Fund Me website. The intimate, emotionally-intense, and continuing nature of the ruse focused directly at plaintiff supports the conclusion that this scheme was done to alarm and seriously annoy.

As we have already noted, much of the trial judge's oral opinion was devoted to explaining the basis for his finding that defendant acted with a purpose to alarm and seriously annoy. Considering all of the circumstances surrounding the manner in which the ruse was committed, we see no reason to disturb the inferences the trial court made to reach its conclusion as to defendant's culpable mental state. We thus conclude that the trial court's finding that defendant's purpose in deceiving plaintiff was to harass her is supported by adequate, substantial, credible evidence.

21

Finally, with respect to whether plaintiff proved that defendant committed the predicate offense of harassment, defendant relies on <u>Hoffman</u> for the proposition that communicative harassment needs to intrude into an individual's "legitimate expectation of privacy." <u>Id.</u> at 583 (quoting <u>Model Penal Code and Commentaries</u> § 250.4 at 372–74 (Am. Law Inst., Official Draft and Revised Comments 1980)). We note first that the Court in <u>Hoffman</u> was referring to the type of harassment proscribed by N.J.S.A. 2C:33-4(a), not N.J.S.A. 2C:33-4(c). Nor did the Court impose an inflexible, per se rule when it stated that, "[t]he catchall provision of N.J.S.A. 2C:33-4(a) should generally be interpreted to apply to modes of communicative harassment that intrude into an individual's 'legitimate expectation of privacy.'" <u>Ibid.</u> (quoting <u>Model Penal Code and Commentaries</u> § 250.4 cmt. 6 at 374). But even if we were to extend the privacy-intrusion principle to the offense codified in N.J.S.A. 2C:33-4(c), and even were we to assume further that intrusion of privacy should be treated as if it were a material element of the harassment offense that must be proved by a preponderance of the evidence, in this instance, the record clearly shows that plaintiff's scheme intruded upon plaintiff's right of privacy.

The Court in <u>Hoffman</u> offered the example of writing a letter to the editor of a newspaper as a form of communication that would not be deemed to intrude

on a legitimate expectation of privacy for purposes of the PDVA, even if the letter were written with the purpose to annoy.  Ibid.  We offer another example of non-intrusive behavior to underscore the intrusive nature of defendant's conduct in this case.  If a person were to feign terminal illness to solicit financial donations from strangers, that scheme, while criminal under the theft and fraud provisions of the Code of Criminal Justice,[4] would not intrude upon victims' privacy rights.

But that is not what happened here.  Rather, defendant by means of her elaborate deception exploited a pastor's charity, manipulating plaintiff's emotions and gaining access to her homestead.  Defendant is hard pressed to argue in these circumstances that the hoax did not intrude upon intimately private aspects of plaintiff's life.

In sum, applying appropriate deference to the Family Part judge who heard the witnesses at the plenary hearing, we conclude that plaintiff proved by a preponderance of the evidence that defendant committed the predicate act of harassment in violation of N.J.S.A. 2C:33-4(c).

---

[4] Fraud is not one of the listed predicate offenses in the PDVA.  Accordingly, a financial scam of the type presented in our example would not constitute domestic violence.

## VI.

We turn, finally, to whether the record supports the trial court's finding that entry of an FRO is needed to protect the plaintiff and her family from further abuse. The issuance of an FRO is by no means automatic and is not to be done by rote upon a finding that a predicate act of domestic violence has been committed, especially when there has been no act of physical violence or threat of physical violence. The decision to issue a domestic violence FRO entails a two-step process. Silver v. Silver, 387 N.J. Super. 112, 125–27 (App. Div. 2006). Once a plaintiff establishes a predicate act, the court must determine "whether a restraining order is necessary, upon an evaluation of the [facts] . . ., to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

We recognized in Silver that a domestic violence FRO has "tremendous consequences" for the party against whom it is entered. Id. at 120. Given those consequences, we cautioned that "[t]he Act is intended to assist those who are truly the victims of domestic violence. It should not be trivialized by its misuse in situations which do not involve violence or threats of violence." Id. at 124 (quoting Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999)).

A-5712-17T1

This case does not involve an act of physical violence or threats of such violence. Nor was there any history of domestic violence between these parties, which is another important consideration. Id. at 126. In the absence of both actual or threatened physical violence and a past history of domestic violence between the parties, courts should be especially circumspect before issuing an FRO, and courts should be precise and comprehensive in explaining the reasons for doing so.

In this instance, no argument was made, nor could be made, that defendant faces immediate danger. Rather, the issue before us is whether the trial court properly found that an FRO is needed to protect the victim and her family from "further abuse." The trial court predicted in this regard that defendant "will continue to victimize either the plaintiffs or others."

We are concerned that in announcing this finding, the trial court may have conflated the need to protect plaintiff and her family with the analytically and legally distinct interest in protecting society-at-large—the "others" the court referred to. Protecting others from falling prey to a repetition of defendant's scam certainly is a legitimate goal of the criminal justice system, but not the PDVA. The suite of remedies set forth in the act, including an FRO, are designed to protect those who seek a court order as victims of domestic violence.

A-5712-17T1

Those remedies are not intended to afford protection to persons who have no relationship with individuals who obtain a temporary or permanent court order pursuant to the PDVA. Accordingly, it is necessary to remand the case for the trial court to clarify whether the need to protect the victim and her family from further abuse was sufficient to warrant entry of an FRO without regard to the likelihood that defendant will perpetrate a similar hoax on others in the future.

Furthermore, on remand the trial court should provide more detailed reasons for its conclusion that plaintiff is at risk from further abuse by defendant even though plaintiff is now aware of defendant's deception. In the specific context of this case, we interpret the term "further abuse" as used in the PDVA to mean a repetition or continuation of defendant's abusive conduct that was found to constitute harassment.[5] Because plaintiff and her family are now aware of defendant's hoax, it is not immediately apparent to us how they might be vulnerable to any future deception by defendant. We therefore remand for the trial court to explain why an FRO is needed to protect plaintiff and her family.

---

[5] We recognize that defendant attempted to contact plaintiff's daughter after the TRO was issued, although the daughter was not listed in the TRO as a protected party and there is no indication that the contact was done in a threatening manner.

Remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION