# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3575-20
              A-1963-21

K.K.,

      Plaintiff-Respondent,

v.

D.W. Jr.,

      Defendant-Appellant.

_____

D.W. Jr.,

      Plaintiff-Appellant,

v.

K.A.K.,

      Defendant-Respondent.

_____

      Submitted March 4, 2024 – Decided March 21, 2024

      Before Judges Mawla and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket Nos. FV-13-0959-21 and FV-13-0337-22.

D.W. Jr., appellant pro se.

Law Offices of Curt J. Geisler, attorneys for respondent (Curt J. Geisler and Amy E. Lefkowitz, on the briefs).

PER CURIAM

These consolidated appeals stem from allegations of domestic violence between the same parties. In A-3575-20, defendant D.W. Jr. ("D.W.")[1] appeals from the court's entry of a final restraining order ("FRO") against him, obtained by plaintiff K.A.K. ("K.K.") In A-1963-21, D.W. appeals from the dismissal of his temporary restraining order ("TRO") against K.K entered three days later. We affirm in both matters.

I.

The facts were adduced at the FRO hearings in A-3570-20 and the motions in A-1963-21. On January 25, 2021, K.K. applied for and received a TRO in Monmouth County against D.W. K.K. reported a prior history of domestic violence between the couple, including an incident where D.W. grabbed K.K.

---

[1] The parties' initials are used to protect confidentiality, pursuant to Rule 1:38-3(d)(9)-(10). Additionally, because they switch from plaintiff to defendant and vice versa we use their initials throughout the opinion.

A-3575-20

by the hair and forced her into a wall. K.K.'s grandparents, S.M. and R.M., were included in the TRO. K.K. then amended the TRO to add further details about claims of domestic violence and previous acts of domestic violence.

In February 2021, before the FRO hearing commenced, the court quashed a subpoena D.W. had issued to Matthew B. Abrams, an attorney who represented R.M. in an estate planning matter, because Abrams was not present at any meeting with D.W. Further, D.W. stated he intended at trial to call F.D., K.K.'s ex-boyfriend, to testify about the truthfulness of K.K.'s allegations against D.W. The court barred F.D. from appearing because his testimony would be irrelevant and speculative.

At the FRO hearings, K.K. presented testimony from five witnesses and testified on her own behalf. D.W. presented testimony from ten witnesses, testified on his own behalf, and played surreptitious recordings he made of phone calls with K.K.

K.K. first testified to her history with D.W. She testified she works in New York City but lived with her grandparents in Freehold during the COVID-19 pandemic while maintaining her New York City apartment. While in Freehold, she became interested in helping with the property and investigated setting up solar panels. She found D.W.'s solar panel installation business on

3

Google. Although she spoke with D.W.'s father on the phone, D.W. met with her and S.M.

Later, K.K. invited D.W. to dinner with the intention of proposing he perform per diem electrical work for her family, but she thought they had a personal connection after the dinner concluded. They started casually dating in August 2020. Early in their relationship, D.W. disclosed he had been incarcerated. By September 2020, K.K. tried to end the relationship because she thought it was progressing too quickly. She returned to her apartment in New York City and recalled D.W. calling her and texting her often. She informed him she was only interested in a friendship, which did not reduce the number of times he called or texted her. She explained at times he would be very nice to her, but at other times he would become angry and "take stuff out" on her. At one point, he accused her of spending time with ex-boyfriends.

In October 2020, to compensate him for helping with electrical work at her grandparents' home, K.K. obtained sod for free and helped place it in D.W.'s yard at his home in Jackson. While she was helping place the sod in his yard, D.W. became angry at K.K., threw tools out of his car, and backed his car into hers.

Also in October 2020, D.W. revealed to K.K. that he disclosed her

sensitive personal family matters about an inheritance to an attorney he knew. He provided K.K. with the name of the attorney and instructed her to call him. K.K. became uncomfortable and alarmed by D.W.'s intrusion into her family life, but he claimed his intention was only to help her. She repeatedly asked D.W. to stop disclosing information about her family's interpersonal relationships. Later, she discovered D.W. was recording their phone conversations without her permission.

Also in October 2020, D.W. showed up at her grandparents' home without permission, which K.K. had already explained to him he should never do as it would cause her grandmother distress. Meanwhile, D.W. told K.K. he was alone and sad, which caused her to feel guilty and invite him to dinner occasionally. K.K. described D.W.'s behavior as "weird" because he acted like he did not have to leave her grandparents' home when he was asked to.

K.K. recalled, in mid-October, D.W. slapped her after they were intimate at his home in Jackson. Afterwards, K.K. lightly slapped him back. However, the altercation ended when D.W. hit K.K. "so hard, [she] knew not to keep playing the slap-back game" with him. Immediately after he hit her, he grabbed her hair and forced her head to face upwards towards the ceiling. D.W.'s actions caused her to drop a towel she had wrapped around her body.

5

On Halloween that year, D.W. asked K.K. to put out candy for the trick-or-treaters at his home in Jackson. Despite being busy, she did so. When she arrived with the candy she purchased, she also decorated the home. When D.W. learned K.K. could not stay for the evening, he became angry and punched the decorations off the porch. After she left, she felt guilty she did not stay with him that evening.

By November 2020, K.K. was still trying to end the relationship but also felt bad for D.W. because he claimed he had medical problems. When she would stop calling him, he would call relentlessly to apologize and be "really nice" only to become extremely angry with her again shortly afterwards. When K.K. repeatedly told D.W. he needed anger management and therapy, D.W. sent her a text message suggesting he was going to harm himself.

Subsequently, there was a portion of November and December 2020 where K.K. did not see D.W. However, they still communicated on the phone. While she understood he wanted to be her boyfriend, she was not interested in being that serious with him and told him so.

In early December 2020, D.W. texted K.K. to claim he was suffering from an unspecified emergency and for her to call him immediately. Upon calling, K.K. discovered D.W. did not have an emergency, but rather only wanted to

talk. As the days passed, he continued to pressure her to call him through repeated text messages and phone calls. K.K. invited D.W. to spend Christmas Eve with her because he claimed he was alone and did not have a place to go.

On December 27, 2020, K.K. called D.W. to tell him about a cat she helped find a home for, and, in response, D.W. accused her of using him. During that call he stated he no longer wanted to see her, which K.K. testified made her feel happy and relieved. However, the next day, D.W. started calling and texting her repeatedly about restarting their romantic relationship. She did not respond.

On New Year's Eve, D.W. started sending K.K. numerous messages through online platforms, such as Instagram. When K.K. did not respond, D.W. sent messages implying he was going to harm himself. In subsequent messages, he called her a "b***h," a "hoe," and a "lying b***h." He said "f*** you" and accused her of "want[ing] to do f****d up s**t to [him]." Next, he started sending her photographs of personal items she left at his home.

K.K. answered a phone call from D.W. on January 3, 2021, because he had again showed up at her grandparents' home without permission, which scared her. During that call, he pressured her to stay on the phone with him for over an hour and to have another phone call with him in a few days. A few days later, D.W. tried to arrange to see K.K. to allow her to retrieve her personal

items, but ultimately his messages turned aggressive, and he demanded she return a gold chain he gave her as a Christmas gift.

K.K. agreed to return the chain. That same day, he threatened to "f**k with" her and put a lien on her grandparents' property. That call was followed up with several instances of D.W. calling K.K. and hanging up. Next, D.W. stated he was "depressed," and again implied he was going to harm himself.

The two then spoke on the phone, and D.W. requested K.K. come to his home to have intercourse, which she declined. Afterwards, D.W. made it difficult for K.K. to meet with him to retrieve her belongings. For example, after they scheduled a day to meet at his house for the retrieval, D.W. arrived late and K.K. discovered he had not boxed up her items. K.K. returned the chain, but while inside his house, D.W. began throwing items around and following K.K. around the home for all but ten seconds. D.W. then accused her of returning a necklace that was different from the one he had given her. K.K. became nervous and called the Jackson police. D.W. then accused K.K. of stealing $10,000 in cash from his home. He also threatened that S.M.'s (her grandfather's) attorney was prepared to file a lawsuit against her on D.W.'s behalf for the gold chain and money and to release audio recordings allegedly proving K.K. tried to unduly influence S.M. and engage in "nefarious acts."

D.W. then attempted to meet with K.K.'s family to discuss the solar project.  On January 24, 2021, S.M. told K.K. that D.W. had come to his attorney's office and played recordings of conversations between K.K. and D.W. in which K.K. was cursing and venting about her family.  Shortly thereafter, K.K. obtained the initial TRO against D.W.  After obtaining the TRO, D.W. posted photographs on social media showing him within a few blocks of K.K.'s apartment in New York City.

S.M. testified he owns the home located in Freehold.  He was present when D.W. appeared at his lawyer's office.  S.M. further testified they did not discuss the solar project during that meeting, and he had not spoken to D.W. since that day.  S.M. maintained he never leased any part of the land in question to a solar company or finalized the solar project.

Matthew Genovese, a telecommunications officer with the Jackson Police Department, testified K.K. had met with D.W. to return a piece of jewelry, but D.W. disputed that the piece of jewelry was the proper item.  At one point, D.W. claimed K.K. had stolen the jewelry and he wanted to press charges against her.

Anthony Riso, a patrolman with the Jackson Police Department, testified he responded to D.W.'s home on January 15, 2021.  K.K. was trying to return a gold chain that D.W. gave her as a gift.  D.W. did not believe it was the same

9

gold chain and a dispute ensued. K.K. reported to Officer Riso it was the correct gold chain and, also, that she feared D.W. would make false allegations against her. A short time later, K.K. asked a different officer to take a picture of the gold chain she returned, but D.W. refused to allow the officer to take a photograph. A few moments later, D.W. exited the home and accused K.K. of stealing $10,000 in cash that he kept in an unsecured "cubby" near the front door.

Joseph Pante, a police officer with the Jackson Police Department, testified he went with Officer Riso to D.W.'s home. K.K. asked him to take photographs of the gold chain she was returning to D.W., but D.W. refused to cooperate. A few moments later, D.W. accused K.K. of stealing $10,000 in cash.

A former coworker of K.K.'s testified K.K. received an unusual number of phone calls from D.W. on September 12, 2020. The court allowed the testimony because it was incorporated in the Complaint when K.K. stated she tried to end the relationship and D.W. called and texted her relentlessly.

D.W. testified he had a criminal history, namely a marijuana cultivation conviction and a possession of a firearm conviction, both from 2008.[2] In relation

---

[2] D.W. admitted during cross-examination that he was also indicted for felony reckless conduct in 2004, but entered into a plea agreement that placed him on probation.

to those convictions, D.W. possessed seventeen marijuana plants, 2,733 rounds of ammunition, and seven guns, including an Uzi machine gun. He spent nine years in federal prison as a result. Afterwards, he started working for his father's solar company, where he is currently the vice president.

D.W. testified he initially met K.K. after she called his father to inquire about a solar project. D.W. discussed the details of a possible solar project with her. A few weeks later, they started dating. D.W. stated he celebrated Christmas 2020 with her family, but K.K. tried to throw him out of the home after she engaged in a verbal altercation with her mother. After the parties ended their romantic relationship, he wanted her to remove her personal items from his house. D.W. alleged when K.K. was collecting her personal items, she stole an envelope containing $10,000. Additionally, when she returned a gold necklace he gave her as a gift, D.W. suspected it was not the original necklace. He claimed K.K. called the police that evening to cause a distraction, allowing her to steal the money. Additionally, K.K. wanted a $300,000 finder's fee in connection with the solar project. He believed K.K. told her family about his criminal history to interfere with the solar project deal.

R.S., K.K.'s uncle, testified he first met D.W. when D.W. purchased an antique cabinet from him. He also accompanied K.K. to D.W.'s house when she

11

collected her personal items. He recalled K.K. exited the home with an envelope, which she opened in front of him. It contained only a card, and he declined when she offered to have him read it.

Amber Neely, a New Jersey State Trooper, testified D.W. came to the police barracks on January 28, 2021, because he was concerned a business agreement he had for a solar deal would be impacted by the active TRO against him.[3] Trooper Neely prepared an amendment to the TRO that allowed D.W. to be on K.K.'s family's property in Freehold to conduct business related to the solar deal.

Yasmeen Khaleel, Esq., testified she represented S.M. in estate planning matters and previously represented R.M. D.W. attended a meeting where Khaleel represented S.M., and D.W. discussed a solar project on a property owned by a business entity partially controlled by S.M. She recalled S.M. arguing with D.W. about the specifics of the project, location of the solar panels, and whether a certain deadline could be met. K.K. was not present at the meeting, and she was no longer dating D.W. at the time of that meeting. Ultimately, a contract for solar panels was not executed by the entity because

---

[3] The court called Trooper Neely out of order "out of respect for Trooper Neely's schedule" and pursuant to the court's authority under N.J.R.E. 611 to take witnesses out of order.

one of the owners was not amenable. K.K. was not an owner of the entity.

William Wright, Esq., testified he represented S.M. in matters of estate planning. Wright was present at the meeting where D.W. discussed the solar project. After the meeting, Wright sent a notice to the business entity's shareholders to hold a special meeting to discuss D.W.'s solar project proposal. At some point in the meeting, D.W. stated K.K. wanted a "finder's fee" in connection with the project and claimed she stole $10,000 from him. It was Wright's understanding that K.K. and D.W. initially had a business relationship that later developed into a romantic relationship. D.W. wanted the solar project to move forward even though K.K. had terminated their personal relationship.

A resident of New York City testified she started dating D.W. on January 30, 2021. She testified she traveled throughout New York City with D.W. in February 2021 and took pictures of him at various spots throughout. Further, D.W. told her he did not post pictures of them together on his social media page because of a problem he was having with K.K.

D.W.'s father testified he gave D.W. $10,000 in cash in a yellow envelope for safekeeping and it disappeared shortly thereafter. On cross-examination, he stated the money was from his attorney. However, he could not recall when it was given to him but stated he gave the money to D.W. the day after he received

it. He claimed the money was a refund for an overpayment to his lawyer who gave him the money in cash instead of a check or money order and that his attorney brought the cash to his office in Jackson.

S.M. Jr., K.K.'s uncle, testified he and his father are both part-owners of the business entity, and his father was interested in participating in a solar contract on a property they shared an ownership interest in. He saw emails about the possibility of a solar contract with D.W.'s company, but the deal was not completed. He learned after the fact that K.K. hoped she would receive a commission in relation to the solar project.

K.K.'s aunt testified she personally observed D.W. being "a little abusive" and "disrespectful" towards K.K. She disputed D.W.'s claim that K.K. tried to throw D.W. out of her family's house on Christmas Day in 2020. On New Year's Day in 2021, D.W. expressed his interest in proceeding with a solar project on a piece of land owned by K.K.'s family. On cross-examination, she recalled K.K. reported to her that D.W. was abusive towards her when she was helping him place sod on his lawn.

An employee of D.W.'s father testified he was present when K.K. helped D.W. with his lawn. He was unhappy K.K. attempted to direct him on how to complete the lawn project. He did not see D.W. throw tools at or threaten K.K.

14

Kenneth Ross, Esq., an attorney who represented S.M., Jr., testified D.W. tried to move the solar project forward after his relationship with K.K. ended and that K.K. mentioned D.W.'s criminal history as an issue with the solar contract. On cross-examination, Ross revealed K.K. did not raise the issue of D.W.'s criminal history with him directly, but rather that someone else told him K.K. raised the issue. Ross confirmed D.W. presented him with documents regarding his criminal history.

On Friday, June 25, 2021, the court found defendant committed predicate acts of domestic violence and a FRO was needed to protect K.K. The court also granted K.K.'s application for counsel fees subject to the filing of a certification of services.[4]

Three days after the Monmouth Vicinage court issued the FRO, D.W. went to the Ocean County Court House and filed a TRO against K.K. He alleged K.K. compelled her mother to make false allegations against him and harass him. D.W. also stated the parties had a prior history of domestic violence because K.K. allegedly scratched him in September 2020, hit him and slapped

---

[4] K.K.'s attorney filed a certification of services totaling $33,455.20 in relation to K.K.'s application for counsel fees. On August 16, 2021, the court awarded K.K. $28,335 in attorney's fees. The court set forth its reasoning in a statement of reasons, as well as on the record on June 25, 2021.

him in October 2020, and made false allegations against him in April 2021.

K.K. filed a motion to transfer venue to Monmouth Vicinage. The motion was granted. However, D.W. filed a motion for reconsideration, which the presiding judge of the Family Part in Ocean Vicinage denied.

D.W. then moved to recuse the judge who presided over the initial FRO trial against him. The judge scheduled a hearing on the recusal motion, but D.W. did not appear despite receiving notice, so the judge adjourned the matter for one week. D.W. again did not appear, despite receiving notice. The court concluded his absence was deliberate and then determined she was not required to recuse herself under the applicable case law and court rules.

K.K.'s counsel filed a motion in limine to dismiss the TRO on the basis that D.W. made the application to harass K.K. and her family and, also, to relitigate matters that were resolved at the original FRO hearing. D.W. opposed the motion and then moved for leave to amend his TRO.

The court granted K.K.'s motion to dismiss D.W.'s TRO. It concluded the factual basis for D.W.'s TRO was "almost identical" to the assertions D.W. made as affirmative defenses in the FRO trial, which were rejected as not credible. Moreover, it found D.W. was "playing games with the court" with his allegations that he did not receive notice of the court hearings on his own recusal motion.

16

The court determined the doctrine of collateral estoppel applied to all but one of the allegations in D.W.'s TRO against K.K.

The court explained the only remaining unresolved allegation from the prior litigation was whether K.K. allegedly had her mother make false allegations against D.W. the night before the court rendered its decision entering the FRO against him. The court concluded allegations that K.K.'s mother made false statements would be against K.K.'s mother, not K.K., because overall, D.W. could not establish K.K. had a purpose to harass him.

D.W. moved for reconsideration of the court's decision to dismiss his TRO. K.K. filed a cross-motion for attorney's fees. Both motions were denied because the parties agreed to withdraw them.

## II.

Our review of a court's decision after a bench trial is limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). In reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)). Trial court findings are "binding on appeal when supported by adequate,

substantial, credible evidence." G.M. v. C.V., 453 N.J. Super. 1, 11 (App. Div. 2018) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).

"We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412). Deference is particularly appropriate "when the evidence is largely testimonial and involves questions of credibility." In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997).

We do not disturb a trial judge's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise.'" C.C., 463 N.J. Super. at 428 (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453

N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18.  Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D., 207 N.J. 458, 473 (2011) (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts "liberally construe [the PDVA] to achieve its salutary purposes."  Cesare, 154 N.J. at 400.

A judge must engage in a two-step analysis when determining whether to grant an FRO under the PDVA.  Silver v. Silver, 387 N.J. Super. 112, 125, (App. Div. 2006).  First, the judge must be satisfied, by a preponderance of the credible evidence, the plaintiff has proven the occurrence of one or more of the predicate acts enumerated in N.J.S.A. 2C:25-19(a).  Ibid.  See also N.J.S.A. 2C:25-29(a) (providing an FRO may only be granted "after a finding or an admission is made that an act of domestic violence was committed"); R. 5:7A(d) (mirroring the language of N.J.S.A. 2C:25-29(a)).  Second, the judge must determine whether an FRO is warranted to protect the plaintiff.  Silver, 387 N.J. Super. at 126; see also J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25-29(b)) (explaining the judge must find "relief is necessary to prevent further abuse").

A.

As a threshold matter, D.W. alleges the court lacks "personal" jurisdiction over him and subject matter jurisdiction to hear the case. Our Court has held New Jersey courts "have all requisite subject matter jurisdiction to adjudicate a complaint seeking relief under the [PDVA]" pursuant to N.J.S.A. 2C:25-28(a). Shah v. Shah, 184 N.J. 125, 135-39 (2005). Pursuant to N.J.S.A. 2C:25-28(a), a plaintiff may apply for relief under the PDVA where the alleged act of domestic violence occurred, where the defendant resides, or where the plaintiff resides or is sheltered. For a court to have personal jurisdiction over a party, that party must reside in New Jersey or in cases of non-residents, must have minimum contacts with New Jersey. Id. at 139-40; see also Blakey v. Cont'l Airlines, Inc., 164 N.J. 38, 66-69 (2000) (discussing minimum contacts needed to establish personal jurisdiction).

D.W. does not dispute he is a resident of New Jersey, so his allegation concerning personal jurisdiction fails on its face. To the extent D.W. argues the court lacked subject matter jurisdiction over the matter, this argument also fails. See Shah, 184 N.J. at 135-39 (holding all New Jersey courts possess subject matter jurisdiction over complaints under the PDVA).

20

D.W. also complains the court never concluded a specific act of domestic violence occurred in Monmouth County.  However, this allegation is belied by the record.  The court specifically found D.W. appeared at K.K.'s grandparents' home in Freehold on two occasions without permission and that those acts caused her to fear for her safety.  Additionally, K.K. sheltered at the family home in Freehold for much of the COVID-19 pandemic.  Thus, the court had venue over this matter because two of the alleged acts of domestic violence occurred in Monmouth County.

## B.

D.W. also claims the court's factual findings and conclusions of law were not supported by the record and, therefore, the FRO was not warranted.  Rather, D.W. "firmly believes that the facts relied upon by the lower court are both misstated and should be interpreted differently."  Even if K.K.'s allegations were taken as true, they would not satisfy the standard needed to obtain an FRO.

When analyzing whether an FRO would be issued, the court explained K.K. and D.W. were in a qualifying relationship because they agreed they dated and were intimate with each other.  Next, the court concluded the predicate act of criminal coercion, N.J.S.A. 2C:13-5, was established because defendant engaged in behavior to restrict or infringe upon K.K.'s freedom of action.  For

example, he threatened to accuse K.K. of an offense, disclose private information that would cause K.K. to lose her credibility in her business, and acted in a matter to harm K.K.'s health, safety, business, career, financial condition, reputation, and personal relationships.

The court also concluded the predicate act of harassment, N.J.S.A. 2C:33-4, was established because D.W. made repeated communications to K.K. and engaged in a course of conduct both intended to alarm and annoy her. Specifically, he called her hundreds of times and texted her repeatedly, despite her stating she was no longer interested in a relationship with him. He also recorded their private conversations, refused to accept her rejection of him, threatened her, and claimed he would harm himself as a form of manipulation. Further, he tried to drive a wedge between K.K. and her family, threatened to share information about K.K.'s largest client to damage her reputation, and inserted himself into K.K.'s family matters.

The court determined an FRO was necessary to protect against future violence or immediate threat of harm. In this regard, the court found K.K. was "very, very compelling." She credibly testified she needed protection from D.W. because he wanted to upset, control, and confuse her. The court determined the

evidence adduced at trial demonstrated D.W. was obsessed with K.K. and he would not leave her alone unless the FRO was entered.

Domestic violence is described as a "pattern of abusive and controlling behavior injurious to its victims." Cesare, 154 N.J. at 398 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 52 (App. Div. 1995)). That is exactly what the court presented in its comprehensive legal and factual analysis of the evidence adduced at trial, which included witness testimony from seventeen individuals, documentary evidence, and audio recordings. There was adequate evidence in the record to support the trial court's findings, and there is no evidence in the record that would compel findings to the contrary.

## C.

D.W. contends the court failed to afford him due process. First, he argues the court prevented witnesses from testifying that would have shown K.K. to be dishonest and, also, by controlling the order of witnesses and the presentation of evidence. Second, he claims the court forced him to present defense witnesses before K.K. finished presenting her case-in-chief because he was unaware of the allegations against him, and K.K. was allowed to tailor her allegations to the witness testimony. Third, he alleges the court considered evidence outside of the contents of the TRO without giving him notice, "forced him to defend every

interaction" with K.K., and "subjected him to moving target allegations." Fourth, he contends the court's inclusion of an additional protected party in the FRO violated his due process rights by restricting his freedoms unnecessarily and there was no evidence he had caused K.K. harm.

D.W.'s due process claims lack merit. The trial lasted for ten days over the course of several months. There is no indication he lacked the time to prepare. Additionally, there is support in the record for the court's decision to preclude D.W. from calling Abrams and F.D., K.K.'s ex-boyfriend. The court properly precluded their testimony because they lacked personal knowledge of material facts. Also, the record reflects D.W. was aware of, and consented to, the court calling the witnesses out of order to accommodate the schedules of the police officers. Regardless, the court had the inherent power to control the order of the witness testimony. N.J.R.E. 611(a) (allocating broad authority to the trial court over the sequence of witnesses).

D.W.'s claim that the court erred when it added family members as a protected party in the FRO is also without merit. The evidence adduced at trial demonstrated D.W. attempted to insert himself into various aspects of K.K.'s life and her family's life. For example, D.W. appeared at her family's property in Freehold without invitation on two occasions. Also, he appeared at meetings

between K.K.'s family and their attorneys without invitation. The testimony and evidence demonstrate D.W. threatened to harm K.K., her family, and her family's finances.

D.

D.W. alleges the court's award of attorney's fees was erroneous and excessive. He states he "prevailed on two of the four predicate acts." Moreover, he blames the fees K.K. incurred on the court's decisions to: make him present his witnesses "before ever hearing K.K.'s allegations;" hear testimony outside the scope of the TRO; and take breaks during the trial. Finally, he alleges K.K.'s attorney double-billed for her time by charging for entire trial days while also working on other cases.

Counsel fee awards under the PDVA are compensatory. N.J.S.A. 2C:25-29(b)(4). Therefore, the PDVA allows the court to award attorney's fees as a remedy for a violation and counsel fees can be awarded if they are reasonable. Ibid.; see also McGowan v. O'Rourke, 391 N.J. Super. 502, 507 (App. Div. 2007) (allowing for attorney's fees in domestic violence matters). The court does not apply the traditional counsel fee application analysis to a PDVA counsel fee award. N.J.S.A. 2C:25-29(b)(4); see also N.G. v. J.P., 426 N.J. Super. 398, 422 (App. Div. 2012) (stating the award of counsel fees in domestic

violence matter requires no special showing because fees are a form of monetary compensation); McGowan, 391 N.J. Super. at 507-08 (stating the traditional analysis does not apply when awarding fees in a domestic violence matter). "[A] reviewing court will disturb a trial court's award of counsel fees 'only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)).

Here, there was ample, credible evidence in the record to support the court's conclusion that attorney's fees were warranted, and, as a result, there was no abuse of discretion. The trial lasted for ten days over a period of months, and there were seventeen witnesses called. The allegations included D.W.'s claims that K.K. interfered in a solar panel project that he wanted to finalize with her family. As a result, the court heard testimony from various attorneys and K.K.'s family members about those interactions and meetings. D.W. presented numerous audio recordings that allegedly demonstrated K.K.'s interference with the solar project. D.W. also challenged K.K.'s claim that she did not disclose his prior criminal history to her family, which resulted in additional evidence being presented at trial. What is more, in terms of the domestic violence

allegations, the court heard extensive testimony from K.K. and D.W. about the frequent interactions that caused K.K. alarm.

K.K. was clearly the prevailing party, having proven that D.W. committed the predicate domestic violence acts harassment and criminal coercion, and the need for the protection of an FRO. Moreover, the court considered and reduced the amount of fees to reflect that she did not prove the predicate acts of stalking and contempt of a domestic violence order.

The court recognized the hours spent on the matter, combined with K.K.'s attorney's hourly rate, were reasonable when compared with the rate charged by other attorneys who practice in this area of law. The record does not support any of D.W.'s challenges to the counsel fee award. The court did not abuse its discretion.

## IV.

### A.

D.W. argues there was not good cause to transfer his TRO against K.K. from Ocean Vicinage to Monmouth Vicinage. He contends the predicate offense for his TRO took place at his residence in Jackson and K.K. is a resident of New York. He further states the motion to transfer venue was made "ex parte" and without providing him with notice.

27

The New Jersey Domestic Violence Procedures Manual provides as follows:  "Pursuant to N.J.S.A. 2C:25-29 and Rule 5:7A, a FRO hearing is to be held 'in the county where the ex parte restraints were ordered, unless good cause is shown for the hearing to be held elsewhere."[5]  Sup. Ct. of N.J. & Att'y Gen. of N.J., New Jersey Domestic Violence Procedures Manual, § IV(H)(1) at 71 (Apr. 22, 2022).

D.W. filed his domestic violence complaint on the first business day following entry of the FRO against him.  The substance of his TRO included allegations that were litigated in the FRO.  Therefore, the Monmouth Vicinage judge was fully familiar with the prior allegations, the parties, and their relationship having conducted the domestic violence trial.  As a result, there was ample good cause to grant the motion to transfer venue.

D.W.'s claim that he did not have notice of the motion lacks merit.  The record on appeal reflects K.K.'s counsel informed D.W. and the court of her intention to seek a venue transfer and the court sent all communications to the email address he provided and had been using.

---

[5]  The manual may be found online at https://www.njcourts.gov/sites/default/files/courts/family/dvprcman.pdf.

B.

D.W. claims the trial judge should have recused herself from his application for a FRO because she was biased against him after presiding in the first FRO hearing. We are unconvinced.

Pursuant to Rule 1:12-1(g), a judge shall be disqualified from sitting in any matter if there is any "reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead . . . the parties to believe so." It is improper for a judge to withdraw upon the mere suggestion that the judge is not qualified "unless the alleged cause of recusal is known to [the judge] to exist or is shown to be true in fact." Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J. Super. 350, 358 (App. Div. 1986); see also State v. Marshall, 148 N.J. 89, 276 (1997) (explaining judges should not err on side of caution by granting recusal motions). An adverse ruling against a party is not considered to be bias. Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008).

The decision to recuse lies within the sound discretion of the trial judge. Jadlowski v. Owens-Corning Fiberglas Corp., 283 N.J. Super. 199, 221 (App. Div. 1995). "When examining a trial court's exercise of discretionary authority, we reverse only when the exercise of discretion was 'manifestly unjust' under the circumstances." Newark Morning Ledger Co. v. N.J. Sports & Exposition

Auth., 423 N.J. Super. 140, 174 (App. Div. 2011) (quoting Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 149 (App. Div. 2007)).

Here, the trial judge did not abuse its discretion when she declined to recuse herself. The record reflects no objective evidence of bias and the fact D.W. received an adverse ruling from the judge does not, itself, warrant the judge's later disqualification. Marshall, 148 N.J. at 95. Moreover, a judge's mere participation in a previous proceeding is not a ground for disqualification. State v. Walker, 33 N.J. 580, 591 (1960); see also N.J. Div. of Youth & Fam. Servs. v. L.C., 346 N.J. Super. 435, 438-39 (App. Div. 2002) (stating that a judge is not disqualified from ruling over a termination matter because the same judge presided over the earlier protective services action); State v. Flowers, 109 N.J. Super. 309, 312 (App. Div. 1970) (explaining recusal is not warranted when a judge decides subsequent proceedings).

## C.

D.W. argues the court misapplied the doctrine of collateral estoppel. Collateral estoppel prevents the re-litigation of issues formerly adjudicated and fully disposed of. Barker v. Brinegar, 346 N.J. Super. 558, 565-66 (App. Div. 2002). The notion of judicial efficiency prevents the duplication of lawsuits with the same issues, the same parties, and the same witnesses. Cogdell v. Hosp.

Ctr. at Orange, 116 N.J. 7, 26 (1989); see also State v. Gonzalez, 75 N.J. 181, 186 (1977) (explaining that collateral estoppel bars re-litigation of any issue decided in prior action).

For collateral estoppel to apply, the issues must be identical to the ones presented in the prior proceedings, the issues must have been actually litigated in the prior proceeding, the court must have entered a final judgment, the issues raised in the new complaint must have been essential to the prior judgment, and the party against whom collateral estoppel is asserted must have been a party in the earlier proceeding. Olivieri v. YMF Carpet, Inc., 186 N.J. 511, 521 (2006). An appellate court's review of a trial court's decision to invoke collateral estoppel is made pursuant to a de novo standard. Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 173 (App. Div. 2000).

Here, the court correctly concluded collateral estoppel prevented the court from re-hearing testimony and re-deciding issues that were fully decided in the FRO hearing. The court examined in detail the parties' history of domestic violence, including acts from September and October 2020, evaluated K.K.'s and D.W.'s claims about what occurred in their relationship, and determined K.K. did not disclose D.W.'s criminal history to her family. Importantly, D.W. was given the opportunity to present testimony and respond to all of K.K.'s claims,

31

which he then included in his domestic violence complaint filed just three days after the hearing. See Twp. of Brick v. Vannell, 55 N.J. Super. 583, 587-88 (App. Div. 1959) (holding the court could take judicial notice of trial record of prior court proceeding).

This case is distinguishable from L.T. v. F.M., 438 N.J. Super. 76 (App. Div. 2014), upon which D.W. relies. In L.T., the plaintiff alleged assault in a Law Division tort case after successfully obtaining an FRO against the defendant. Id. at 81-82. The trial court applied the doctrine of collateral estoppel and barred the defendant from defending against the plaintiff's allegations of assault. Id. at 83-84. Noting the summary nature of an FRO trial as compared to the procedure in the Law Division, and the higher standard of proof for the punitive damages sought by the plaintiff in the intentional tort action, we reversed.

Unlike the offending party in L.T., here, the parties are not burdened with defending against allegations under a higher standard of proof. Nor are they defending against allegations in a new court with procedures differing from those used in the original FRO trial. Therefore, we reject D.W.'s argument that collateral estoppel should never be applied in domestic violence cases. The judge correctly concluded D.W. was collaterally estopped from alleging the

A-3575-20

prior incidents that were raised and found not credible as part of his defense in the first case.

The remaining allegation in D.W.'s domestic violence complaint was his contention that there was "irrefutable evidence" K.K. forced her mother to make false allegations against D.W. on the phone the night before the court entered the FRO. The court concluded there was no evidence K.K. had acted with purposes to harass and to the extent the mother's conduct was harassing, those allegations could be made against the mother, not K.K.

Harassment through a third person is proven by showing it was the defendant's

> conscious object to use [the third-person] as an instrument of harassment.
>
> . . . .
>
> . . . There is rarely direct proof of intent, and purpose may and often must be inferred from what is said and done and the surrounding circumstances. . . . Prior conduct and statements may be relevant to and support an inference of purpose.
>
> [State v. Castagna, 387 N.J. Super. 598, 605-06 (App. Div. 2006).]

Our review of the record convinces us the judge did not err. D.W. failed to demonstrate via the surrounding circumstances or the alleged conduct and

33

statements of K.K.'s mother that K.K. intended to use her to harass him. Rather, the evidence shows K.K. did everything within her power not to have contact with D.W.

To the extent we have not specifically addressed D.W.'s remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in A-3575-20 and affirmed in A-1963-21.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION